# DAVIS *v.* SCHWARTZ.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA, EASTERN DIVISION.

No. 75.  Argued November 12, 13, 1894. — Decided January 7, 1895.

In a case referred to a master to report the evidence, the facts and his conclusions of law, there is a presumption of correctness as to his finding of facts similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. Stat. § 469, or in an admiralty cause appealed to this court.

In Iowa, an insolvent debtor may make a mortgage or other conveyance of his property to one or more of his creditors, with intent to give them preference, and, in the absence of fraud, such mortgage or conveyance will not operate as a general assignment for the benefit of creditors, unless intended so to operate.

The fact that the property so conveyed was much in excess of the debts secured by the conveyance is not necessarily indicative of fraud; but in such cases the question of good faith is one of fact, and a mere error of judgment will not be imputed as a fraud.

The different transfers assailed in this suit examined, and, in the light of these rulings, held to be valid.

The different mortgages assailed in this suit were for several and separate interests; and the one to Kent not being of the amount requisite to give this court jurisdiction, the appeal as to him is dismissed.

THIS suit was originally begun by a petition filed December 29, 1884, upon the equity side of the District Court of Lee County, Iowa, by certain creditors, who had previously attached the stock in trade at Fort Madison, Iowa, of one John H. Schwartz, to set aside and vacate four chattel mortgages upon such property, and subject the same to the payment of their debts.

Upon the following day the suit was removed, upon the

petition of the plaintiffs Samuel C. Davis & Co. of St. Louis and E. S. Jaffray & Co. of New York, to the Circuit Court of the United States for the Southern District of Iowa, in which court the record was filed January 9, 1885. Subsequently, and on January 17, a receiver was appointed, who took possession and made an inventory of the property, and soon thereafter sold the same for the net sum, after deducting costs and expenses, of about $50,000, which was placed at interest by order of the court, and, with the accumulated interest, amounts now to upwards of $66,000, held by the court to abide its order herein.

To this petition of the attaching creditors separate answers were interposed by Catharine Schwartz, John H. Hellman, Frank B. Kent, and the German-American Bank, the four mortgagees, wherein each defendant set up his mortgage and notes ; and as these answers also set up certain affirmative facts, which could not be met by replication, the petitioners, under leave of the court, filed an amended bill in equity, to which not only Schwartz and the four mortgagees were made parties, but a large number of other attaching creditors, whose interests plaintiffs averred to be inferior and subject to their own liens. Answers were filed to this bill by John H. Schwartz and the four mortgagees. Several of the other attaching creditors also interposed by answer and cross-bill. One Katie Kraft also intervened, setting up a promissory note for $5000, and claiming the benefit of a mortgage, not only upon the stock of goods at Fort Madison, but upon another stock at Chariton, Iowa. A supplemental bill was also filed setting up judgments obtained by the plaintiffs in the actions at law in favor of Samuel C. Davis & Co. in the sum of $14,358.20, and in favor of E. S. Jaffray & Co. in the sum of $6168.07. Subsequently, another amended bill was filed, alleging that Catharine Schwartz and Frank B. Kent had caused to be inserted in their respective mortgages a large amount of property owned by Schwartz in Chariton, which property they had seized and converted to their own use. The prayer of the bill was that the mortgagees be required to account for and pay into court the value of the property

so seized and converted, and that it be distributed under the order of the court.

It appeared that this Chariton stock was sold out by the mortgagees, and the proceeds, amounting to some $7000, placed in the German-American Bank. Of this amount, $4075 was paid over to Catharine Schwartz, and a certificate of deposit for the sum of $2500 delivered to the bank for the use of Kent.

A large amount of testimony was taken, and finally on January 16, 1889, the case was referred, by consent of parties, to a master "to hear said causes and report to this court his findings of facts and conclusions of law."

The following is a summary of the most important facts: John H. Schwartz, a citizen of Iowa, residing at Fort Madison, had for some years been a retail dry goods and clothing merchant, carrying on his principal business at Fort Madison, with an estimated stock of about $100,000, and with a branch store at Chariton estimated at about $16,000, and another at Dallas City, Illinois, estimated at $17,000. In addition to this, he owned real estate in Fort Madison valued at $17,000, together with notes and accounts, stock in a ferry company, and in a building association, the value of which was somewhat uncertain. There were a mortgage and mechanic liens upon the real estate to the amount of about $13,000, under which the property was sold, and the values therein involved figure only indirectly in this controversy.

At this time, December 29, 1884, Schwartz was indebted to plaintiffs Samuel C. Davis & Co. to the amount of some $14,000, and to E. S. Jaffray & Co. to the amount of some $6000, for goods sold, and to a somewhat greater amount to various other creditors in smaller sums. He was also indebted to one of his mortgagees, John A. Hellman, his father-in-law, to the extent of $22,180.37, evidenced by seven promissory notes of different dates given from time to time during the eight previous years, for money borrowed and put into the business; and was further indebted to the German-American Bank in the sum of $8168.35; to Catharine Schwartz, his mother, in the sum of $11,306.51, and to Frank B. Kent in the sum of $2665. His

total indebtedness appears then to have been about $84,000 and his assets about $144,000. Late in December, some $6000 of his indebtedness to Jaffray & Co. falling due, he wrote to his father-in-law for his endorsement upon a promissory note for that amount. Hellman, desiring to investigate his son-in-law's business before becoming responsible for a further amount, went to Fort Madison, learned the amount of his debts and assets, refused to advance any more money or sign the notes, and advised Schwartz to send for the representatives of Davis & Co. and Jaffray & Co., tell them of his situation and intentions, and ask for an extension of time.

Schwartz accordingly telegraphed for these representatives, who arrived at Fort Madison on Saturday morning, December 27, and held a conference with him at his house in the presence of Hellman. Schwartz gave a full account of his debts and assets, and asked for an extension of the Davis and Jaffray claims. Schwartz and Hellman claim that they were given to understand that the extension would be granted, and that the representatives of these firms would return after dinner with the extension notes prepared for Schwartz to sign. There is some dispute as to what was done that day, but instead of returning to Schwartz, it appears that the two representatives prepared petitions for attachments upon his stock, though the writs were not issued, apparently because they were awaiting indemnity for the surety upon the attachment bond. It seems that Schwartz and Hellman became suspicious at the failure of the representatives of the two firms to return with the extension notes, and on Sunday evening met at the residence of one of their counsel, Casey & Casey, at which were present John H. Hellman, John H. Schwartz, H. D. McConn, cashier of the German-American Bank, and Joseph B. Schwartz, a brother. After midnight and before dawn of Monday morning the 29th, the four chattel mortgages in question were drawn up, taken to the bank, acknowledged before a notary, and delivered to the recorder of deeds and filed by him about 5 o'clock in the morning.

A demand was immediately made by the mortgagees upon Schwartz for payment. The latter, expressing regret that he

was unable to comply with such demand, presented to each one of the mortgagees a key to his store in Fort Madison, where the largest part of the goods was. Whereupon the mortgagees at once, and at a very early hour in the morning, entered into possession, put up notices that the goods were being sold under mortgage, and by the time the attachments were levied, had made sales of about $70 worth of property.

As soon as it was known that the mortgages were made and the mortgagees were in possession, Davis & Co. and Jaffray & Co. sued out their writs of attachment, and at once levied the same upon the stock of goods and upon the real property owned by Schwartz in Fort Madison. Under indemnity bonds given by the attaching creditors, the sheriff, as provided by the statutes of Iowa, continued in possession, the mortgagees relinquishing their claim to the property and falling back upon the present suit to enforce their debts.

The master made his report on January 1, 1890, finding the mortgage to Hellman valid, and the others invalid, upon the ground that they embraced notes or accounts claimed to be owing by Schwartz to the mortgagees, which were not in fact debts due to such mortgagees; that the amount so secured had been fraudulently exaggerated for the purpose of defrauding the general creditors; and adjudging that, so far as such mortgagees had received payment on their debts derived from sales of the property mortgaged, they should account to the attaching creditors, who had garnished such mortgagees, according to the priority of such creditors, in effecting these garnishments.

To this report exceptions were filed by both parties, and, the case coming on to be heard before the court, certain exceptions of the defendants were sustained, and a final decree entered adjudging the several mortgages to be valid conveyances and first liens, and dismissing the bill so far as the same attacked the validity and priority of such mortgages. The decree then proceeded to find the several amounts due the mortgagees, ordered that they should be paid out of the fund in court, and the surplus, over and above paying mortgage debts and receiver's costs and expenses, was ordered distrib-

uted to the general creditors *pro rata;* that is, in proportion to the amount shown to be due and owing said parties from the insolvent debtor. It was further decreed that the mortgage defendants served as garnishees be discharged as such garnishees, and as the fund in court had been loaned upon bond and security to the Polk County Savings Bank of Des Moines, that the clerk withdraw the money from such bank, and make payment to the several parties adjudged to be entitled thereto. From this decree plaintiffs appealed to this court.

*Mr. John W. Noble,* (with whom were *Mr. James C. Davis* and *Mr. Eben Richards* on the brief,) for appellants.

*Mr. David Sheean* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This is a contest between the attaching creditors and the chattel mortgagees of the property of John H. Schwartz, an insolvent debtor formerly engaged in business at Fort Madison and Chariton in the State of Iowa, and at Dallas in the State of Illinois. These two classes of creditors are in reality competitors in a race of diligence, the object of which was to obtain a lien upon and possession of the property in question.

1. As the case was referred by the court to a master to report, not the evidence merely, but the facts of the case, and his conclusions of law thereon, we think that his finding, so far as it involves questions of fact, is attended by a presumption of correctness similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. Stat. § 649, or in an admiralty cause appealed to this court. In neither of these cases is the finding absolutely conclusive, as if there be no testimony tending to support it; but so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable. *Wiscart* v. *D'Auchy,* 3

Dall. 321; *Bond* v. *Brown*, 12 How. 254; *Graham* v. *Bayne*, 18 How. 60, 62; *Norris* v. *Jackson*, 9 Wall. 125; *Insurance Co.* v. *Folsom*, 18 Wall. 237, 249; *The Abbotsford*, 98 U. S. 440.

The question of the conclusiveness of findings by a master in chancery under a similar order was directly passed upon in *Kimberly* v. *Arms*, 129 U. S. 512, in which a distinction is drawn between the findings of a master under the usual order to take and report testimony, and his findings when the case is referred to him by consent of parties, as in this case. While it was held that the court could not, of its motion, or upon the request of one patry, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers, yet where the parties select and agree upon a special tribunal for the settlement of their controversy, there is no reason why the decision of such tribunal, with respect to the facts, should be treated as of less weight than that of the court itself, where the parties expressly waive a jury, or the law declares that the appellate court shall act upon the finding of a subordinate court. "Its findings," said the court, "like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise." As the reference in this case was by consent to find the facts, we think the rule in *Kimberly* v. *Arms* applies, and as there is nothing to show that the findings of fact were unsupported by the evidence, we think they must be treated as conclusive. To same effect are *Crawford* v. *Neal*, 144 U. S. 585, 596; *Furrer* v. *Ferris*, 145 U. S. 132.

2. The real question in this case is, whether the mortgages, which were awarded priority of payment by the decree of the court below, were valid securities at the time of the Schwartz failure, or were fraudulent and void as against his general creditors. If they were in fact given *bona fide* and for a valuable consideration, it is difficult to see why they should not be upheld, notwithstanding they were given for precedent debts, were executed and acknowledged under an impending fear of

attachment, at a most unusual hour of the day, and were immediately foreclosed by the mortgagees and possession taken of the property. There are undoubtedly *indicia* of fraud connected with the transaction, but, after all, they are only items of testimony bearing upon the main question, and if there be nothing to impeach the consideration and the good faith of the parties, the fact that the mortgagees intended to obtain a preference over other creditors should not invalidate the mortgages, since the very object of giving such securities is to give a preference to the creditors therein designated. *Hutchinson* v. *Watkins*, 17 Iowa, 475; *Chase* v. *Walters*, 28 Iowa, 460; *Stewart* v. *Mills County Bank*, 76 Iowa, 571.

The fact that the assignee or the preferred creditor of an insolvent debtor is a relative or intimate friend is doubtless calculated to excite suspicion; yet in reality there is nothing unnatural in a dealer or trader who is in need of credit, or a loan of money to carry on his business, first applying to his relatives for such loans, and if the evidence be undisputed that the money was advanced, the fact that the persons making the loan are relatives ought not to debar them from receiving security. Their rights are neither increased nor diminished by the fact of relationship. *Magniac* v. *Thomson*, 7 Pet. 348; *Prewit* v. *Wilson*, 103 U. S. 22; *Estes* v. *Gunter*, 122 U. S. 450; *Bean* v. *Patterson*, 122 U. S. 496; *Garner* v. *Second National Bank*, 151 U. S. 420, 432; *Aulman* v. *Aulman*, 71 Iowa, 124; *Van Patten* v. *Thompson*, (Iowa,) 34 N. W. Rep. 763; *In re Alexander*, 37 Iowa, 454; *Doyle* v. *McGuire*, 38 Iowa, 410. A general assignment to a relative as trustee for the benefit of creditors is open to more suspicion, since such are more often selected as instruments for creating a secret trust in favor of the assignor.

It is also true that the mortgages must have been given for a valuable consideration, and must have been executed and received in good faith and for an honest purpose. It has been the accepted law ever since *Twyne's Case*, 3 Coke, 80, that good faith as well as a valuable consideration is necessary to support a conveyance as against creditors. In that case Pierce, being indebted to Twyne in 400 pounds, was

sued by a third party for 200 pounds. Pending such suit he conveyed all his property to Twyne in consideration of his debt, but continued in possession, sold certain sheep and set his mark on others. It was resolved to be a fraudulent gift, though the deed declared that it was made *bona fide*. Most of the cases illustrative of this doctrine, however, have been like that of Twyne, wherein a debtor, knowing that an execution was to be taken out against him, had sold his property to a vendee having knowledge of the facts, for the express purpose of avoiding a levy, or receiving a consideration which could not be reached by execution. In such cases the fact that he receives a good consideration will not validate the transaction, unless at least the creditor has obtained the benefit of the consideration. A like principle applies where a mortgage is given and withheld from record in order to give the mortgagor a fictitious credit. *Cadogan* v. *Kennett*, Cowp. 432; *Blennerhassett* v. *Sherman*, 105 U. S. 100, 117; *Sayre* v. *Fredericks*, 1 C. E. Green, (16 N. J. Eq.,) 205; *Sweet* v. *Wright*, 57 Iowa, 510, 514; 1 Story's Eq. Juris. § 353; *Klein* v. *Hoffheimer*, 132 U. S. 367; *Holt* v. *Creamer*, 34 N. J. Eq. (7 Stewart) 181; *Clements* v. *Moore*, 6 Wall. 299; *Wickham* v. *Miller*, 12 Johns. 320; *Pulliam* v. *Newberry*, 41 Alabama, 168; *Robinson* v. *Holt*, 39 N. H. 557.

In Twyne's case, the facts that the sale was accompanied by a secret trust in favor of the debtor, and that the vendor remained in possession, showed that it was not intended as a *bona fide* preference to the creditor, but merely as a trick to keep the property away from the other creditors.

But where a person, being lawfully indebted to several creditors, makes a mortgage or other conveyance to one for the open and avowed purpose of preferring him, then in the absence of a law of the forum prohibiting preferences, such mortgage or conveyance is valid, though it may operate to bar other creditors from obtaining satisfaction of their debts. A mortgage which may have the effect of hindering other creditors is not necessarily unlawful, though a mortgage given to defraud them is always so. *Stewart* v. *Dunham*, 115 U. S. 61; *Estes* v. *Gunter*, 122 U. S. 450; *Smith* v. *Craft*, 123

U. S. 436; *Huntley* v. *Kingman*, 152 U. S. 527; *Southern White Lead Co.* v. *Haas*, 73 Iowa, 399, and cases cited.

In this case the preferred creditors receive no more than they are entitled by law to have, and the fact that they know that other creditors will suffer by their preference does not show a want of good faith. The effect of every mortgage to a creditor as security for the payment of a preëxisting debt is to withdraw the value of the property covered by the security from the assets of the debtor, which would otherwise be available in satisfaction of his other debts. But unless a general bankrupt law, or a law of the particular State makes the preference illegal, it is difficult to see why mortgages given under the circumstances that these were given should be held to be invalid. The fact that they were given at night, under the instant apprehension of legal proceedings, and that their execution was followed by an immediate delivery of possession, only indicates that the insolvent debtor wished, in the selection of his creditors, to prefer his own friends, rather than the plaintiffs, who would have secured to themselves the position of preferred creditors by suing out attachments and levying upon his property. In short, they were attempting to do what the mortgagees themselves successfully carried out. The equities of the latter are at least equal to those of the plaintiffs. We do not understand it to have ever been doubted that a debtor may openly prefer one creditor to the rest, and may transfer property to him or give him security even after others have begun their actions. *Holbird* v. *Anderson*, 5 T. R. 235. In that case it was said by Lord Kenyon, p. 238 : "The words of the statute, 13 Eliz., do not apply to this case, for this warrant of attorney was given on a good consideration; and the other words in the act, '*bona fide*,' only apply to those cases where possession is not delivered, or where it is merely colorable." See also *Estwick* v. *Caillaud*, 5 T. R. 420.

The fact that the execution of the mortgages was immediately followed by a delivery of possession of the property mortgaged, so far from being a badge of fraud, has rather a contrary tendency, and was evidently resorted to to avoid an implication of fraud from the retention of possession by the

mortgagor. A prompt and vigorous enforcement of an honest debt is by no means indicative of fraud, and it does not lie in the mouth of the plaintiffs, who were themselves taking steps in the same direction as the mortgagees, to cavil at their success.

It is also true that, by the law of Iowa respecting assignments for the benefit of creditors, preferences are forbidden; but the authorities in that State hold that a sale or mortgage to pay or secure the payment of preëxisting *bona fide* debts is not to be considered an assignment within the statute, even when made in contemplation of insolvency, or when the debtor, by the mortgage, intends to hinder other creditors who are about to obtain liens upon his property, unless, at least, the mortgage was intended to operate, not as a security, but as a general assignment for the benefit of creditors, or is made in such connection with a general assignment as to constitute both but one and the same transaction. *Farwell* v. *Howard*, 26 Iowa, 381; *Southern White Lead Co.* v. *Haas*, 73 Iowa, 399; *Gage* v. *Parry*, 69 Iowa, 605; *Kohn* v. *Clement*, 58 Iowa, 589; *Aulman* v. *Aulman*, 71 Iowa, 124.

It is sometimes difficult to determine whether a particular instrument is a mortgage or an assignment with preferences. The test most frequently applied is whether the conveyance is of all the property of the debtor, and is made to a trustee for the benefit of certain creditors. In such cases it is usually held to be an assignment, but if the conveyance be made directly to the creditor himself, it is ordinarily treated as a chattel mortgage. Jones on Chattel Mortgages, § 352 *a*; Burrill on Assignments, p. 11.

We do not regard the fact that the property conveyed was nominally more than double in value to the amount of debts secured thereby to be in itself indicative of fraud, since the property conveyed was a stock of goods of somewhat uncertain value, and when sold realized but little more than was necessary to pay off the mortgages. Indeed, this court held directly in *Downs* v. *Kissam*, 10 How. 102, 108, that it was not even a badge of fraud that a mortgage was made to cover more property than would secure the debt due.

The fact that goods were spirited away from the store on Sunday night would undoubtedly assume a serious importance were it shown to have been done directly or indirectly for the benefit of Schwartz; but the goods seem to have been taken away in a sleigh by some of the clerks, who took this method of paying themselves for the amounts due them for wages, aggregating $282.77. It appears that they took no more than sufficient to reimburse themselves, and that they were charged upon the books with the goods taken at cost price. Although, of course, the proceeding was irregular, there is no evidence to connect either Schwartz or the mortgagees with it, and the clerks did no more for themselves than Schwartz would have been at liberty to do for them if he had been present, viz., to prefer them to the amount of the wages severally due them.

The case, then, reduces itself to the simple question whether the mortgages were given for *bona fide* existing debts to the amount expressed upon their faces, and this involves an inquiry into the consideration of each mortgage separately.

3. So far as regards the mortgage to John H. Hellman, which covered only the stock at Fort Madison and the book accounts, both the master to whom the case was referred and the court, agreed in holding it to be valid. In this connection the master found Schwartz to be indebted to Hellman, his wife's father, as evidenced by his notes, for money borrowed, amounting with interest to $22,180.37; that Hellman before leaving Galena had prepared memoranda of these notes, which amounted upon their face to $20,380.98, together with another note for $1000, payable to his son John V. Hellman, in consideration of money loaned to Schwartz. This note had been assigned by the payee to his wife Wenona, but, being afraid that Schwartz was in a bad way financially, it was agreed between the father and son that the former should purchase the note, which was then in his safe; that Wenona should endorse it; that the father should be charged with it on his books, and the son, who was then owing the father to that amount or more, should be credited therewith. But the entry upon the books was not made until after John H. Hellman returned from Fort Madison, and was then entered as of December 29.

As the note really belonged to John H. Hellman, and was transferred to him before he left Galena, though the entry had not yet been made, there can be no just criticism upon his including it in his mortgage. Even if the purchase had not been made, there is nothing improbable in John V. Hellman's desiring that his wife's note should be secured, and if he suspected, as he doubtless did, that Schwartz was likely to fail, he would naturally put the note in his father's hands to be secured with the much larger amount due his father; and if the latter caused it in good faith to be included in his mortgage, supposing it to be lawful to do so, the mortgage would not thereby be invalidated.

4. The mortgage to the German-American Bank, which covered not only the stock at Fort Madison, but that at Chariton, and the book accounts at both places, was given on its face to secure two notes of $5000 and $500 made to the bank, as well as a note for $1500 made to H. Cattermole, president of the bank, and assigned to the bank, together with a note of $1000 to Pauline Schwartz, also assigned to the bank, — these notes aggregating $8000. This mortgage was found by the master to be fraudulent, as against the general creditors, by reason of the inclusion of the Cattermole and Schwartz notes.

So far as concerns the Cattermole note, the finding is that McConn, the cashier of the bank, who acted for it at the Sunday evening meeting at Schwartz's house, demanded not only security for the bank, but for Cattermole himself. As Cattermole was not present, no transfer of the note could have then been made by him, and there is no pretence that it was then transferred. The note was not produced at the time, and McConn knew that there was no entry upon the books of the bank to show that the bank owned the note. It appears that the bank afterwards became the owner of the note by giving therefor its own note in exchange, although it is not certain when this took place, since the books of the bank show no entry whatever of the transaction, either to charge the bank with the liability or to credit it with the Cattermole note as an asset. But putting a construction upon this transaction most favorable to the plaintiffs, it only appears that the bank did not actually own

the note at the time the mortgage was given. The Cattermole note had been given by Schwartz for money loaned, and had been in possession of the bank for two and a half months before the failure. The money had been loaned to Schwartz under a promise by him to give a real estate mortgage, and McConn, who was a cousin of Cattermole, upon the failure of Schwartz to give the mortgage, had agreed to take the note off of his hands.

The mortgage of $1000 to Pauline Schwartz was sold and delivered by John H. Schwartz to McConn for about two-thirds its face value and interest. It seems that the money represented by this note had been sent, in 1879, in the form of a draft, by Hellman to his daughter Pauline, who was the wife of John H. Schwartz, as a Christmas present. Schwartz appears to have used the money himself, and given his note therefor, dated December 27, 1879. When the mortgage was given, he turned it over to the bank for its face value upon his wife's request that he should realize upon it for her. No entry was made upon the books of the bank because, as McConn explained, "it was a small matter, and we thought it would be adjusted in a few days, and we did not want any more of John H. Schwartz's matters mixed up." The money to pay for the note was taken from an envelope in the bank by McConn. This was undoubtedly outside of the usual course of banking business and was open to some suspicion; but there is nothing to impeach the consideration for which the note is said to have been given, and nothing but the somewhat unusual nature of the transaction to contradict McConn's story with reference to this purchase by the bank.

Of both these notes it may be said that whether they were actually owned by the bank or not, there is nothing to indicate that they were not just debts of John H. Schwartz. It would also seem that McConn's inclusion of these notes in the mortgage to the bank was made in good faith, supposing that he had the right to cover them by the same security he was taking in favor of the bank. While the fact that a mortgage is given for a larger amount than is due, is doubtless a suspicious circumstance, raising a presumption of fraud, and may, under certain circumstances, avoid the whole mortgage, ( *Wood*

v. *Scott*, 55 Iowa, 114; *Lombard* v. *Dows*, 66 Iowa, 243; *Taylor* v. *Wendling*, 66 Iowa, 562; *McNichols* v. *Rubleman*, 13 Mo. App. 515; *Holt* v. *Creamer*, 34 N. J. Eq. (7 Stewart) 181; *Heintze* v. *Bentley*, 34 N. J. Eq. (7 Stewart) 562; *Mead* v. *Combs*, 19 N. J. Eq. (4 C. E. Green) 112,) it will only have this effect when given wilfully, in connivance with the mortgagee, and with an actual design to impose upon and defraud the general creditors.

In all such cases the question of good faith is one of fact, and a mere error of judgment will not be imputed as a fraud. The fact that the debt so included was a *bona fide* debt, and that the act of the mortgagee in so including it was subsequently affirmed by the creditors interested, will be strong evidence that no actual fraud was intended. *Shirras* v. *Caig*, 7 Cranch, 34; *Lombard* v. *Dows*, 66 Iowa, 243; *Davenport* v. *Cummings*, 15 Iowa, 219; *Miller* v. *Lockwood*, 32 N. Y. 293; *Frost* v. *Warren*, 42 N. Y. 204; *Goff* v. *Rogers*, 71 Indiana, 459, 461; *Barkow* v. *Sanger*, 47 Wisconsin, 500, 505; *Van Patten* v. *Thompson*, (Iowa,) 34 N. W. Rep. 763.

5. The mortgage to Catharine Schwartz was given to secure one note for $2296.35; another for $500; a note for $5000, payable to Katie Kraft, Schwartz's sister, upon which Catharine Schwartz was surety; a note for $318, payable to A. S. Gage & Co., upon which Catharine was surety, and which had been paid by her; and also the sum of $2382.97 due upon an open account for goods and merchandise, and cash advanced and owing by John H. Schwartz. This mortgage is assailed as fraudulent, upon the ground that the last item consisted of merchandise and cash advanced to John H. Schwartz from another store in Fort Madison, the business of which was solely conducted by Joseph C. Schwartz in the name of his mother, Catharine. It seems that when the business began she loaned to Joseph $8000, which composed the capital of the concern, which loan was secured by note. He bought and sold the goods, paying all the bills, and not accounting to her, save to pay the interest due upon the note, and took the profits to himself. It thus appears that the debt really belonged to Joseph C. Schwartz and not to Catharine, although the three

parties swore that it was due to her as the nominal proprietor of the store. It does,. however, appear conclusively that Joseph was indebted to his mother in a sum largely in excess of the account; that the consideration of the account was goods bought, nominally, at least, of Catharine, and that she was responsible to the creditors of that establishment. As the accounts were kept in her name, she had the legal title to the account, and Joseph only an equity in them. But as, in any event, the debt was *bona fide*, and, under the circumstances, must be presumed to have been included in the mortgage with the consent of Joseph, the mortgage ought not to be held void on that account. It was a debt honestly owing by John H. Schwartz; was intended to be included in his mortgage, and he had as much right to secure his brother Joseph as his mother Catharine. His creditors were not placed in any worse position by reason of the fact that the security was not given directly to Joseph. The form in which the security should be given was really a question between the parties themselves, and did not in any way concern the plaintiffs. So, also, it is quite immaterial whether the Katie Kraft note was originally made to her, or to her husband Joseph, and by him endorsed to her. There is very little, if anything, to indicate that it did not represent a *bona fide* debt, or that Catharine Schwartz, the mortgagee, was not held for its payment. In addition to this, however, Mrs. Kraft, herself, filed an intervening petition, claiming the amount of the note and the benefit of the mortgage to Catharine Schwartz, and a separate decree was made in her favor.

Upon the whole, we think the court below was correct in sustaining this mortgage.

6. The mortgage to Frank B. Kent covered the property both at Fort Madison and Chariton, and was given to secure the payment of a note for $2500, executed by Schwartz, March 1, 1884, and payable one year after date. His decree was for $3601.42.

In this connection a motion was made by Kent to dismiss the appeal from the allowance of his claim, upon the ground that the requisite amount is not involved to give jurisdiction

to this court. We think this motion should be granted. It is true, the four mortgagees were made joint defendants to the bill, but in reality their interests were several. The mortgages were separate, and a several and distinct decree was made in favor of each for the payment of his claim. A separate bill would have lain against each mortgagee, but as certain of the questions involved were common to all the mortgages, they were, as matter of convenience, all made parties to the same bill. The rulings of this court are uniform and consistent to the effect that, where several plaintiffs claim under the same title, and the determination of the cause necessarily involves the validity of that title, this court has jurisdiction, though the individual claims do none of them exceed the requisite amount, but when the matters in dispute are separate and distinct, and are joined in one suit for convenience or economy, the case will be dismissed as to claims not exceeding $5000. *Schwed* v. *Smith,* 106 U. S. 188; *Hawley* v. *Fairbanks,* 108 U. S. 543; *Stewart* v. *Dunham,* 115 U. S. 61; *Estes* v. *Gunter,* 121 U. S. 183; *Gibson* v. *Shufeldt,* 122 U. S. 27; *Henderson* v. *Carbondale Coal, &c. Co.,* 140 U. S. 25; *New Orleans Pacific Railway* v. *Parker,* 143 U. S. 42; *Chapman* v. *Handley,* 151 U. S. 443.

As it is clear in this case that the validity of each mortgage depended upon its own consideration, independent of the others, and the decree in favor of each mortgagee was several and distinct, the motion to dismiss must be granted.

And as we agree that there was no error in the court below holding the other mortgages to be valid securities, and entitled to preference as against the attaching creditors,

*The appeal as to Kent must be dismissed, and as to the others the decree of the Circuit Court must be affirmed.*