## MURPHY v. SOUTHERN RY. CO.

(Circuit Court, N. D. Georgia. January 19, 1900.)

No. 994.

1. REFERENCE—CONCLUSIVENESS OF REPORT.

A finding by a master in chancery as to a question of boundaries, based on an examination of deeds and upon conflicting oral testimony, should not be lightly interfered with.

2. SAME.

A finding by a master in chancery as to the amount of damages will not be interfered with unless it is so inadequate or excessive as to be unreasonable.

In Equity.

Simmons & Corrigan, for plaintiff.

Dorsey, Brewster & Howell, for defendant.

NEWMAN, District Judge. This case is now heard on exceptions by both parties to the report of the special master. The usual rule as to the weight to be attached to the report of a master in chancery is that it is presumed to be correct, and that it will not be set aside unless clearly and manifestly erroneous. Additional weight is given such a report when the reference is by consent of parties. In this case, while the order of reference recites that it is by consent of parties, it is claimed (and such is probably the fact) that the consent was with reference to the person selected as special master, and that it was not strictly an agreement to refer. However this may be, it is true that, after it was determined that the case should be referred, counsel were given the opportunity to agree upon a suitable person to act as special master, and selected the Honorable Howard Van Epps, a lawyer of ability and high standing in the profession, and with lengthy experience on the bench. Judge Van Epps heard the evidence in the case, and the record and his report shows great care and painstaking on his part. His findings should not be lightly interfered with. See Walters v. Railroad Co. (C. C.) 69 Fed. 706; Farrar v. Bernheim, 21 C. C. A. 264, 75 Fed. 136; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289.

The first question for consideration is as to what part of what is called the "D'Alvigny Strip" in the evidence and in the special master's report is owned by Mr. Murphy. He claims that the railroad company has taken part of it, and has laid tracks thereon, while the railway company contends that he had no interest whatever in the part taken. In determining this question, it became necessary for the special master to examine deeds running back for some 30 years, and investigate plats, and hear a large amount of oral evidence. He finally decided the case on his construction of the different deeds bearing on this question, and the descriptions contained therein, and determined that the part of the D'Alvigny strip owned by Mr. Murphy did not embrace any of the land upon which the railway company had entered. After going carefully over the special master's report

on this subject, I am unable to see any good reason why it should not be sustained. There was evidence locating Mr. Murphy's part of this strip further east, so that the tracks of the railroad company would encroach on the same, but the question is peculiarly of the kind where the services of a master in chancery are valuable. He not only had all the documentary evidence before him, but he has seen the witnesses, and has heard them examined and cross-examined; and, having reached a conclusion upon disputed facts, and conflicting evidence, his conclusion should stand.

The other feature of the case, as to which there are exceptions by the complainant, relates to the complainant's right to an easement in what is called the "East Extension of Gray Street." In determining this question, it became necessary for the special master to investigate the matter in several aspects. First, there was a question of law, as to whether a certain stipulation in the deed from Ella Loyd to the Schofield Rolling-Mill Company should be construed as a covenant running with the land, or whether it was a dedication of the strip which is called the "East Extension of Gray Street" to public uses as a street. The special master gave it the former construction, but it will not be necessary to determine whether this legal view of the matter was correct or not, in view of what will be hereafter stated. It became necessary for him also to determine whether there had been any use of this strip as a street by the public. He held that there had not been. On this subject he says:

"The overwhelming evidence in this case establishes that he had no private way legally established to any such road across the tracks, or that any public road or street existed across those tracks. The evidence conclusively establishes that the north extension of Gray street, north of D'Alvigny street, had never been made a public street, nor had the east extension of Gray street to the right of way of the railroad company. It is entirely manifest that nothing but a village or settlement road existed across the railroad tracks at North avenue before it was formally extended, or between North avenue and the east extension of Gray street. The land here was no more than a common, outlying and uninclosed, and existing in a state of nature. The villagers did, indeed, struggle for an outlet across the railroad, and did from time to time pursue first one course then another across this common, but no street or private way was outlined or exclusively used. First one part of the common would be used, and then another; the question of gulleys or other superficial obstacles regulating the choice of those who attempted to cross over this common, or to find an outlet across the railroad tracks. In support of this view I need only cite, without extending this opinion to formally set it forth, the testimony of McColgan (9, 10, and 12), Donaldson (16 and 17), Hansell (28), Stewart (38, 40, and 42), James Loyd (53 and 55), Hall (60, 61, 62, 64, and 65), Jones (65 and 69), Morrow (71, 72, 73, and 75), Holden (12, 80, and 81), McAfee (129), Queen (152), Murphy (137, 139, 159, 339, 343, 349, and 352), Hendricks (187 and 189), Bryant (208, 287, 289, 290, 291, 292, and 293), Hankins (231), Vest (401), Harrison (436 and 442), Roberts (463 and 465), Bell (476), and Smith (477). This evidence establishes that many years ago, before the grading of North avenue, and its extension across the railroad tracks to Marietta street, persons were in the habit of crossing the right of way at some point, not at all definitely located, between where North avenue now crosses, and the land lot line between land lots 81 and 82. No particular place is shown to have been used for any definite time, or kept in repair by anybody. The evidence wholly fails to show any private way or public road or street across the Western & Atlantic right of way. This evidence fails to satisfy the demands of the law. Where a prescriptive right to a private way over land is asserted, it is necessary to show the uninterrupted use of a per-

manent way, not over 15 feet wide, kept open and in repair for 7 years. It is not sufficient to show that those claiming the prescription have been accustomed for more than 7 years to pass over the land, changing the way as they saw fit, to avoid obstructions or for convenience."

Then two other questions on this branch of the case arose, which, it seems to me, will control in its determination. In the complainant's original petition to the superior court of the state, from which the case was removed to this court, he claimed that this east extension of Gray street was used in connection with an outlet over a strip of land between the Schofield Rolling-Mill property and the right of way of the Western & Atlantic Railroad. By a subsequent amendment he claimed that he had an outlet across the railroad into Marietta street, opposite East Gray street. Mr. Murphy sold the strip of land known as the "Schofield Rolling-Mill Tract" to John W. Johnston, under whom, it is admitted, the present railway company claims, and in his deed he conveyed all the land to the right of way of the Western & Atlantic Railroad; thereby parting with all his interest, by a fee-simple conveyance, in and to the part over which, in his original petition, he claimed an outlet from East Gray street. The special master holds him estopped from setting up any claim to an outlet over land which he had thus conveyed. The special master further finds that there was no outlet whatever across the Western & Atlantic Railroad into Marietta street, opposite to East Gray street, as claimed in complainant's amendment, and concludes that Mr. Murphy had no outlet whatever through East Gray street, and that the most that could be claimed for it was that it ran up to and abutted against the railroad right of way, and there ended. He further finds and concludes, as a consequence of this, that Mr. Murphy has not been damaged at all by the laying of the railroad tracks across this strip which is called "East Gray Street." On this subject the special master says:

"In what way is Mr. Murphy damaged by this occupancy upon the part of the railroad of this east extension of Gray street? He had no property abutting upon it. It led only through the property of the railway company. It led only to the property of the railway company. I cannot understand how he was in any wise damaged by the act of the company in taking exclusive possession and control of it, and I therefore will report a finding that he is not in any wise damaged by the act of the railway company in laying their tracks across the east extension of Gray street."

This conclusion of the special master (which will be confirmed by the court) that Mr. Murphy has sustained no damage whatever on account of the occupancy by the railway company of what is called the "East Extension of Gray Street" renders unnecessary the decision of the questions heretofore mentioned. This outlet is of no benefit whatever to Mr. Murphy unless it leads in some way across the railroad tracks into Marietta street. The special master finds that it does not, and there is ample evidence to support his finding.

Another finding of the special master is excepted to by both parties, and this is the allowance of $500 to Mr. Murphy for the actual invasion of the corner of one of the lots, which he undoubtedly owns, by the railway company, and digging down and carrying away his soil. The special master might have found something more, or

he might have found something less, possibly; but the amount he did find is not unreasonable to either party, and it will not be interfered with.

The railway company excepts to the special master's conclusion that the complainant is entitled to an injunction to restrain it from using what is called the "North Extension of Gray Street." The special master held that Mr. Murphy had an easement in this street. as appurtenant to the property which it is conceded he owns, and that the laying of its tracks along and upon the same by the railway company infringed his rights. The special master says that he arrives at this conclusion in favor of Mr. Murphy by the same process of reasoning by which he found against him as to the east extension. In this instance the easement was appurtenant to his property, and was valuable to him, and in the other it was not. His conclusion seems to be fully sustained by the evidence, and it must stand.

In conclusion, it may be stated that the report of the special master in this case is not only satisfactory, but it is an admirable statement and exposition of the rights of the parties in this case. While it is true that there was conflicting evidence, his conclusions seem to be, in every instance, the result of a careful study of the facts, and to be in all respects well supported by the evidence. My main perplexity about this case has been due to the fact of the apparent familiarity of the complainant, Mr. Murphy, with the locality in controversy, and his evident sincerity as to the location of his part of the D'Alvigny strip, as well as the testimony of witnesses before the master who were also apparently familiar with the surroundings, and who located the boundaries of different parts of this strip by physical objects. But after a thorough examination, and careful reflection about it, I am satisfied that all this is not sufficient to overturn the special master's report on this subject. All the exceptions of both parties will be overruled, and a decree entered confirming the report of the special master.