PAAUHAU SUGAR PLANTATION CO. v. PALAPALA.

(Circuit Court of Appeals, Ninth Circuit.   February 8, 1904.)

No. 981.

1. MINORS—RIGHT TO SUE—OBJECTIONS AT TRIAL—NECESSITY—APPEAL.
    Where, in a suit in admiralty in personam for injuries to a seaman, he testified at the trial that he was under 21 years of age, but over 20, at which age Hawaii Civil Laws, § 2144, declares all male persons shall be regarded as of legal age, and defendant made no objection at the trial that by reason of plaintiff's minority he was not entitled to sue alone, such objection could not be first raised by defendant on appeal.

2. SAME—ADMIRALTY CAUSES—APPEAL—TRIAL DE NOVO—REVIEW.
    Though admiralty causes are triable de novo on appeal, where questions of fact are dependent on conflicting evidence the decision of the district judge thereon will not be reversed unless it clearly appears to be against the evidence.

3. SAME—CAUSE OF INJURY—EVIDENCE.
    In a suit in admiralty in personam for injuries to a seaman by being struck by a load of sugar being lowered into a boat by a crane, evidence reviewed, and held to justify a decision of the trial court that the injury resulted from the negligence of the engineer operating the crane in prematurely lowering the sugar, and not from the action of the sea in lifting the boat up and dashing it against the sling.

4. SAME—NEGLIGENCE.
    A winchman was employed to operate a crane by which sugar was loaded from a wharf into a boat. It was his duty to lower the load part

¶ 2. Admission of new proofs on appeal in admiralty, see note to The Venezuela, 3 C. C. A. 322.

way, and then wait until the boatmen signaled that they were ready to receive the load, and then lower the same into the boat; the boatmen being required to hold the boat under the crane by the oars. *Held*, in a suit for injuries to one of the boatmen by the alleged premature lowering of a load of sugar into the boat without signal, that the roughness of the sea at the time, and whether the seaman injured was standing upright in the boat, were immaterial, since, if the sea was rough, it was the winchman's duty to have kept the load out of the way of the boat until signaled to lower the same.

5. SAME—DAMAGES.

Plaintiff, before his injury, was in good health and strong physical condition. His collar bone was injured, and a week after the injury he began to suffer pains in his shoulder joint, and was unable to swing his hand while walking without its causing him pain. Physicians testified that this, together with plaintiff's abnormal temperature and pulse, indicated either tuberculosis or neuralgia, either of which would shorten his life, and the uncontradicted testimony was that on account of such pains plaintiff was unable to perform labor as a sailor, that his injuries were permanent, and that his immediate future earning capacity was seriously impaired. *Held*, that a judgment allowing $3,000 damages, and $65.35 for the amount he would have earned before the trial, was not excessive.

Appeal from the District Court of the United States for the District of Hawaii.

This is a suit in admiralty in personam, to recover damages for personal injuries sustained by the libelant (appellee) while engaged in loading a cargo of sugar, by the alleged negligence of the defendant (appellant herein). The court below awarded to libelant $3,000 damages for the injury, and $65.35 for the amount he would have earned before the trial. From this decree the appeal is taken.

It is claimed by appellant in its assignments of error that the court erred in holding that (1) "the libelant was at the time of the injury some twenty-one years of age;" (2) in holding and deciding that the libelant was injured on account of any negligence or carelessness upon the part of the defendant; (3) in holding that the libelant's state of health at the time of the trial was due to the injury received by him on the 19th of March, 1903; (4) in holding that the present and immediate future earning capacity of the libelant was totally impaired; (5) in rendering judgment in favor of the libelant; (6) and that the sum allowed is excessive.

Holmes & Stanley, Morrison & Cope, Charles B. Marks, and R. D. Silliman, for appellant.

Page, McCutchen & Knight and J. J. Dunne, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts as above).  1. Can the question presented by the first assignment of error, as to the age of appellee, be considered by this court?  In the libel it is alleged that libelant "is about twenty-five years of age."  In its answer defendant "neither admits nor denies the said allegation, but leaves libelant to his proof thereof."  In his testimony at the trial appellee was asked his age, and replied, "I think in the month of July I will be twenty-one. Q. July, 1903? A. Yes."  If the defendant desired to raise the question that appellee could not maintain the suit because not of legal age, it should then and there have made the objection, so that it could have been met by further proof, and the court below might have been called upon to interpret section 2144 of the Civil Law of the Territory

of Hawaii, which provides that "all male persons residing in this re-public, who shall have attained the age of twenty years, * * * shall be regarded as of legal age, and their period of minority to have ceased." See, also, Wood v. Green, 2 Hawaii, 168. And if found to be under age, the appellee could have taken the necessary steps to have his father or some other guardian appointed by the court. The record does not show that any such objections were made in the court below at any time. The court never was called upon to decide this question. All that appears in relation thereto is found in the opinion of the court on the question of damages, where the court said, "The amount of damages to be awarded is usually dependent upon the pain and suffering occasioned by the injury, the age, habits of life, and oc-cupation of the libelant, his ability to earn, and the effect of the injury upon all these things" (this was a correct statement of the law. Grant v. Union Pacific Ry. Co. [C. C.] 45 Fed. 673, 683), and then added, "The libelant was at the time of the injury twenty-one years of age, and a sound, strong, healthy man, with, so far as the evidence shows, no bad habits."

In Knight v. The Attila, Crabbe, 326, Fed. Cas. No. 7,881, the court said:

"If it appears on the face of the libel that the libelant is not entitled to sue, as in the case of an infant or a married woman, the respondent may demur, but if the incapacity does not appear in the libel, although true in point of fact, then the respondent must take advantage of it by pleading in bar or by an-swer."

In the present case it was not presented in any form or manner whatsoever in the court below, and cannot be considered by this court. Wasatch M. Co. v. Crescent M. Co., 148 U. S. 293, 298, 13 Sup. Ct. 600, 37 L. Ed. 454.

2. In considering the other questions presented by the record, it becomes necessary to state the facts upon which the different conten-tions are founded. The appellee was a seaman on board the steam-ship Helene, earning $7.50 per week. Appellant was a corporation engaged in business in Hawaii, operating a sugar plantation and wharf at Paauhau, on the Island of Hawaii, and its sugar was shipped and discharged from said wharf into vessels afloat upon the navigable waters of the port at that place. On the afternoon of March 19, 1903, the date of the injury complained of, the Helene was anchored in the port of Paauhau to receive from said wharf certain sugar for transpor-tation elsewhere. The master of the Helene ordered appellee to go, with certain others of the crew, to said wharf to get a load of sugar, in one of several large boats belonging to the ship used for that pur-pose. The appellee, with others, consisting of four men besides him-self, viz., Kewiki, Toka, Kia, and Hina, went from the Helene to the wharf. The boat in which they were was not made fast to the wharf, but was kept in position with the oars, the surface of the wharf being considerably elevated above the surface of the boat, about 22½ feet above sea level. The process by which the sugar was transferred from the wharf to the boat is as follows: On said wharf there was a der-rick so constructed as to be capable of being swung out over the edge of said wharf so that sugar hoisted thereby would he suspended over

the water. Attached to the upper end of this derrick was a block, and at its heel there was another block, and through these two blocks a wire fall was rove. At one end of this fall was attached a hook used to hoist the sling loads of sugar, while the other end of said fall led to the steam winch which was used to hoist the sugar to the end of the derrick. It further appears from the testimony that, when a sling load of sugar was hoisted to the end of the derrick, the derrick was then swung out, so that such sling load of sugar would be over the water. It then became the duty of the winchman on the wharf to lower the said sling load of sugar part way down, and then hold it to await a signal from the crew in the boat, that signal notifying the winchman when to let the sugar descend into the boat. On the day of the injury a sling load of sugar, containing 10 bags with a gross weight of 1,250 pounds, was hoisted to the end of the derrick and suspended over the water, partly over the boat, the crew of which was endeavoring to so manage said boat as to place it in a proper position to receive said sling load of sugar. While this was being done, the injury occurred, and the appellee was severely bruised, and his collar bone was broken. After the injury, appellee was removed to the Helene, and from there to the Plantation Hospital at Paauhau, where he remained for two days, and was then taken to the United States Division of the Queen's Hospital in Honolulu, where he remained from the 24th day of March, 1903; until the 6th day of May, undergoing treatment for his injuries.

The contention of appellee is that his injuries were the result of carelessness and negligence of appellant through the negligent act of the winchman, who suddenly and without warning let go the sling load of sugar before the crew in the boat had given the signal in accordance with the established method, and before any signal of any kind had been given from the boat; and also by the careless and negligent manner in which the machinery and gear were set in motion by the said winchman. The contention of appellant is that, after the sling load of sugar was suspended over the water, the winchman received a signal from the crew in the boat to lower the sling load part way down; that he did so, and held it there, awaiting a further signal to lower the sling load into the boat, when suddenly the boat was lifted up by a big wave toward the sugar, and the libelant was then struck and injured by coming in contact suddenly with the sling of sugar. There is a sharp conflict in the testimony of the various witnesses as to the immediate cause of the injury, as well as upon certain other points to be hereinafter discussed. Touching the question of the winchman's negligence, the court in its opinion said:

"After a careful consideration of all the testimony in the case, I am of opinion that the injury was not caused by the boat being raised up on a big wave, but that it resulted from the careless and negligent act of the winchman in suddenly lowering the sling load of sugar without warning, and before any signal had been given from the man in the boat."

Inasmuch as admiralty cases on appeal to this court are to be tried de novo, we are asked to review the testimony of all the witnesses, and determine therefrom where the weight and preponderance of the evidence lies, independent of the views expressed by the court below. It has

been the custom and rule of this and other appellate courts, in cases of this character, where the testimony is taken by deposition, or before a master appointed for that purpose, to review all of the material testimony thus given, in order to determine the weight of the evidence; but, where the testimony is taken by witnesses in the presence of the lower court, the rule is now well settled that in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses, and judging their appearance, manner, and credibility, will not be reversed unless it clearly appears that the decision is against the evidence. Whitney v. Olsen, 108 Fed. 292, 296, 47 C. C. A. 331, and authorities there cited; Baker-Whiteley Coal Co. v. Neptune N. Co., 120 Fed. 247, 249, 56 C. C. A. 83; The Oscar B., 121 Fed. 978, 981, 58 C. C. A. 316; Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289.

Does it clearly appear that the decision of the court is against the weight of evidence? The testimony of the witnesses on behalf of the appellant was to the effect that there was a rough sea at the time of the accident, and that the injury to appellee was caused by a wave suddenly lifting the boat and bringing appellee in contact with the sling load of sugar. With this conflict in the evidence, the court below was called upon to determine the probabilities or improbabilities, the reasonableness or unreasonableness, of the testimony of the respective witnesses; the opportunities they had of seeing just what occurred, and knowing how the injury really happened; their character, their manner and appearance on the witness stand; the consistency or inconsistency of their statements—and from all the facts and circumstances developed by their testimony to decide as to the weight of the evidence. We see no occasion to question the veracity of any of the witnesses with regard to the question whether the waves raised the boat so that appellee was struck by the sling load of sugar, or whether he was struck by the sling load of sugar being lowered without any signal being given, because this is one of the things that may have appeared differently to the witnesses who were in different positions. The captain of the Helene, and some of the other witnesses on behalf of appellant, were quite a distance —from 50 to 150 feet—from the boat where appellee was injured, and were more liable to be misled as to the movement of the boat, and of the sling load of sugar, than the witnesses who were in the boat at the time the injury was received. The uncontradicted testimony is to the effect that the winchman stopped the sling load of sugar when it was part way down. All of the testimony on behalf of appellee is to the effect that after thus stopping it, as was the usual custom, he lowered it very fast, without awaiting the signal from the man in the boat, and without giving any warning whatever, and the sling load of sugar struck appellee in the chest, and knocked him senseless. Capt. Nicholson, who was one of the strongest witnesses on behalf of appellant, testified that the sea was rough at the time of the accident. "The sea lifted the boat up and dashed it against the sling. * * * That the sling load was hanging, and the winchman did not drop it. As I saw it, the boat dashed in, and I saw him hit by the sugar. Q. What do you mean when you say the winchman did not let the sugar down?

A. I mean I did not see it come down. If the engine is running you can see her steam." He further testified that the winch is operated, raised, and lowered by steam power, and would not fall of its own weight. "The engine must be working, in any case, to lower or hoist it up."

All other things being equal, the courts are naturally disposed to give more weight to the affirmative than to the negative testimony; to the witness who saw, than to the witness who did not see. This is certainly the natural presumption. In Stitt v. Huidekoper, 17 Wall. 384, 394, 21 L. Ed. 644, the lower court on this subject charged the jury:

"That it is a rule of presumptions that ordinarily a witness who testifies to an affirmative is to be preferred to one who testifies to a negative, because he who testifies to a negative may have forgotten."

This was claimed to be erroneous. The Supreme Court said:

"We are of opinion that the charge was a sound exposition of a recognized rule of evidence of frequent application, and that the reason of the rule, as stated in the charge, dispenses with the need of further comment on it here."

In the view we take of this case, it is unnecessary to review the testimony at any length, as to whether the sea was rough or moderate at the time of the injury. The testimony of all the witnesses was to the effect that the sea was rough in the forenoon. The witnesses on behalf of appellant testified that it continued rough all day—"Very much the same all day"—while the testimony of the members of the crew was that the sea was rough in the forenoon, but moderated in the afternoon. Hina said: "It had been quite rough in the forenoon, but after lunch it was all right." Kewiki said: "In the morning it was windy and rough, but in the afternoon it calmed down." Toka said: "The coast there is not always rough. On that day it was rough in the morning, but not in the afternoon." Kia, the boat steerer, said: "The water was calm enough for work. It was quite calm in the afternoon. * * * No time that afternoon did the waves interfere with the loading of the sugar." The injury occurred in the afternoon.

There is one other point of conflict to which it is necessary to refer. Two witnesses, Westoby and Naka, on the part of the appellant, testified that at the time of the injury appellee was standing up in the boat with his arms extended. This would doubtless have been his position if he was ready for the signal to be given to lower the sugar. He testified that: "Just before the accident I was fixing up the canvas to keep the sugar dry from the waves. As I stood up I was struck. The canvas was not quite out then." Kia said that, when he was struck, "Palapala was on the starboard side of the boat working on this canvas." Hina testified that: "At the time of the accident Palapala was still working on the first sling load, trying to cover it with the canvas. He got no warning that the sling load was coming. We did not expect it to fall." He further said: "The sugar fell on him at the edge of the boat, and when it was hoisted he fell into the boat. He lay still; he could not move." Bob Toka said: "We gave no signal to lower the sugar, because we had to get the canvas that was under the first sling load. We had to get that canvas out before receiving another sling load." Kewiki's testimony is to the same effect. He also said: "When

the sugar was hoisted off of him, he fell from the edge into the bottom of the boat."

As a matter of fact, the carelessness and negligence of appellant depends upon the question whether the winchman was diligent and careful, or negligent and careless, in the performance of his duties; and, so far as this question is involved, it is immaterial whether the sea was rough or not, or whether appellee was standing upright or was working on the canvas. The uncontradicted testimony shows that appellee was in a place of danger. Capt. Nicholson, testifying as to the position of danger, said: ' "It is always dangerous; in the calmest kind of weather it is dangerous. At any time it is always more or less dangerous; sometimes more, but, when that north swell is on, it is worse." The up and down movements of the sugar are regulated by the winch, and controlled by pushing backward or forward the lever. Enos, the winchman, was employed and selected by appellant to perform this duty. His duty has been heretofore mentioned. In no event was he to lower the sling load of sugar at all until he received a signal from the boatswain below, and when this signal was given he was to lower it half way, which would be within the reach of the crew below, so that they could, with their hands, guide and direct it to the desired point; then, upon receiving another signal, to lower it down carefully. His position was one requiring great care and constant watchfulness. If, as appellant claims, the waves were coming in very high, he must have seen them, and he testifies that he saw them—"that the sea was rough at the time." If such were the fact, he should have hoisted the sugar up, and kept it out of the way of the boat if the waves were so strong as to lift it up in the manner testified·to by him and others.

As was said by the court in Glascock v. C. P. R. Co., 73 Cal. 137, 141, 14 Pac. 518, 520:

"If he looked, he saw, and, having age and faculties to understand the dangers, is charged with a knowledge of them, and was bound to act upon that knowledge as a prudent and cautious man would under the circumstances. His failure to so act was negligence."

If the facts were as testified to by the witnesses for appellee, then his negligence would be greater in degree, gross, culpable, and willful in its character. The rule is well settled that the greater the hazard, the greater is the care required. The responsibility of appellant for the negligence of the winchman is well settled. In re California Nav. & Imp. Co. (D. C.) 110 Fed. 670, 673, and authorities there cited; The Anchoria (D. C.) 113 Fed. 982.

In Mather v. Rillston, 156 U. S. 391, 399, 15 Sup. Ct. 464, 39 L. Ed. 464, the court said:

"If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of."

After an examination of all the evidence, we are of opinion that the winchman was negligent in the performance of his duty, and that such negligence was the cause of the injuries received by appellee. The

conclusion reached by the lower court was not against the weight of the evidence.

3. There is no controversy as to the injuries which appellee received. It appears from his testimony that he was in a good, strong physical condition before the injury, and had never had occasion to visit a physician professionally except to be vaccinated and to have a tooth extracted; that he suffered mental and physical pain from the injury, and all over his body for some time after the injury; that, about a week after the pain in the collar bone went away, he had a pain in his shoulder. "Sometimes when walking in the streets and shifting my hand—that is, back and forward—and times when I jerked it, was the time the pain started. Sometimes it would pain all day and all night and the next day, and then the pain will leave me. When I walk in the streets I cannot swing my hand. I have to hold it up in this position (indicating a position of right angles to his body). If I swing it in the streets, it starts to pain me." There was some difference of opinion by the physicians as to the extent of the injuries and the natural consequences resulting therefrom, and as to the condition of appellee's health at the time of the trial, and more particularly as to whether or not his condition was attributable to the injuries he had received or to other causes. The medical testimony raised the question whether the pains in the shoulder joint were normal; whether the pains and fever from which appellee was suffering were tubercular or neuralgic in their character; and, if either, whether they were the natural result of the injuries, or were produced from other causes.

Dr. Humphries, on behalf of appellee, testified as to the pains which appellee said he had suffered, and said it might be the beginning of a tubercular joint; that he would not say that it was not. "Q. What do you mean by saying that it may be a tubercular joint? A. That tuberculosis has set in, in the articulation itself. Q. Made by what conditions? A. The traumatism or the injury is the cause. Q. Is there any other condition that might result from such an injury as this, which might interfere with the earning capacity of the libelant? A. Yes. Q. What? A. It might be neuralgia of the joint. Q. Please explain? . A. Neuralgia of the joint is a disease which may appear as a result of various things, but generally as a result of injury. There are no physical signs. It crops out, as a general rule, some time after the injury. It is not a constant thing, but is intermittent in character, does not increase in pressure, is not cutaneous, does not increase upon drawing the two surfaces of the joints together, is not steady, and not strictly in one place or region. Q. Could a condition such as that result from an injury as has been described in the testimony? A. Yes. Q. Assuming that either one of these two conditions should result, either that the shoulder joint should be tubercular, or that there should develop neuralgia of the joint, what effect would that have upon the ability of this man to work? A. Of course, if it were tubercular it might mean his losing the arm, his losing the shoulder joint, and even the loss of his life. One cannot say where it would finish. It is sure that the effect would be to shorten his life. If it were neuralgia, it might pass off and it might not. If an amputation had to result, there might be a resection of the nerve and a deformity—contraction would

follow." He stated that he was not prepared to say that it was tuberculosis or neuralgia, "but, in my opinion, it is one or the other." He further stated that appellee's temperature and pulse were abnormal; that his temperature was 101½—2 degrees of fever—and his pulse over 100; and he gave it as his opinion that these symptoms were consistent with incipient tuberculosis.

Dr. Wood, on behalf of appellant, upon his first examination stated that his examination of appellee was not for the purpose of discovering the presence or absence of incipient tuberculosis or neuralgia of the shoulder joint. As the result of a further examination, he said he should "bar out neuralgia of the joint." After giving his pulse and temperature as stated by Dr. Humphries, he said: "What should be inferred from that pulse and that temperature, I am not willing to say on so short an examination. I re-examined the joint, and I am satisfied he has not neuralgia. I saw no signs of tuberculosis, with the single exception of the increased pulse and temperature, and the apparent increased pain in moving the joint." A hypothetical question was asked, based upon the facts as to the weight of the load of sugar and the fracture of the clavicle: "Q. There is a traumatism. I will ask you if a traumatism of that kind might not be the cause of tuberculosis or neuralgia of the joint? A. * * * Would say, as to neuralgia, it is exceedingly rare. I would say that tuberculosis might be the direct result of one of the results of that fall, but there must be the germs present to produce tuberculosis."

This testimony is material in so far as it relates to the reasonableness of the amount of damages awarded by the court. The testimony of the physicians indicated that it was somewhat difficult to determine, upon the examinations made, the real cause of appellee's then condition. But independent of the differences as to whether the pains in the shoulder were tubercular or neuralgic, the entire testimony in regard thereto clearly indicates that those pains were the result of the injury; and the uncontradicted testimony is that on account of such pains he did not have the use of his arm so as to enable him to perform labor as a sailor, that his injuries are permanent, and that his immediate future earning capacity is seriously impaired. The doctors differed as to the length of time before he would be able to perform labor.

4. Is the amount allowed by the court excessive? It is the duty of this court to consider all the testimony in this case bearing upon the point of appellee's injuries, the character and extent thereof, the pains he suffered, and also to consider whether or not his injuries were merely temporary or permanent, and the probabilities as to his future sufferings from the injuries he had received, and to what extent his earning capacity had been or might be impaired. The amount awarded may seem large. As is usual, appellant has cited a number of cases wherein it is claimed the injuries were greater, and the damages allowed were less, than in the present case. But this, while proper, does not furnish the true criterion to govern the question. Some latitude must be allowed to the lower courts in the exercise of their sound discretion and best judgment, especially in a case like the present, where all of the witnesses were examined in open court. There is not any ironclad rule of law that can be laid down in all cases. Every case must be de-

termined upon its own merits—upon its own conditions and surroundings. In the light of all the testimony, we are not prepared to say that the amount allowed by the court is excessive.

The decree of the district court is affirmed, with costs.