TRIEBER, District Judge
(after stating the facts). At the hearing of the exceptions to the master’s report, counsel for the defendants attacked the propriety of the granting of the restraining order, and also objected to some of the testimony which had been admitted by the master, although a considerable part of that testimony which was objected to was not considered by the master in preparing his findings-of facts.
As to the first proposition, it is sufficient to say that this court is not an appellate court, with power to review the actions of the other judges of this court. If defendants felt themselves aggrieved by the action of the judge who originally granted the injunction, they had a complete and adequate remedy by appealing to the Circuit Court of 'Appeals for this circuit or the Supreme Court of the United States. Act June 6, 1900, c. 803, 31 Stat. 660, U. S. Comp. St. 1901, p. 550. *367 As to the admission of the improper evidence by the master, it was cured by his disregarding it when making his findings of facts.
In this connection, it may be advisable to call the attention of the profession to the rule laid down by the United States Circuit Court of Appeals for this circuit in Dowagiac Mfg. Co. v. Lochren et al. (lately decided) 143 Fed. 211, where it was held that the proper rule of practice in taking testimony before a commissioner or examiner, or before a master empowered to determine the admissibility of evidence under the equity rules, is to elicit and transmit to the court, not only the evidence which is confessedly competent, relevant, and material, but also that which is deemed incompetent, irrelevant, and immaterial, to the end that, if the reviewing court is of the opinion that the evidence deemed inadmissible should have been received, it may at once consider it and render a final decree without the delay of re-referring the case to procure the rejected evidence. To this general rule the court says there are two exceptions:
“They are, that it is the duty of the court or chancellor eliciting the evidence to consider and determine the claim of privilege of a witness or other party and to refuse to compel him to produce evidence in violation of it, and that, if it clearly and affirmatively appears that the evidence sought cannot possibly be competent, material, or relevant, and that it would be an abuse of the process of the court to compel its production, it may refuse to do so.”
Any other rule would be productive of delay. Suppose that the master should have sustained the objections of the defendants and refused to allow the witnesses to answer the questions objected to, and the court should afterwards hold that it was error for him to do so, or, if the trial court should sustain the master in his findings, and upon appeal to the appellate court that court should hold that the evidence should have been admitted, it would necessitate a re-reference to the master in order to take that proof; while, on the other hand, if the evidence is improperly admitted, the court, or upon appeal the appellate court, can disregard it and make a final determination of the cause without a re-reference. In view of the importance of this case, the master was right in permitting all the evidence offered to be taken, in order that the court may determine its admissibility.
In passing upon findings made by the master, it is the well-settled rule that such findings are prima facie deemed to be correct, and if there is substantial evidence to sustain his findings of fact, although there may be a serious conflict in the evidence, the findings of the master should be sustained. A master has the advantage of hearing the testimony and of seeing the demeanor of the witnesses on the stand, while the court, upon the hearing of the exceptions, has only a transcript of the evidence, with no opportunty to see the witnesses and notice their demeanor while testifying.
Another question, which should be determined before passing upon the merits of the case and determining the exceptions to the master’s report, is whether this court has jurisdiction in this proceeding of Bohnen, Crowe, and Mellville, who were now parties to the original suit and had never been restrained by any order of the court. In Re Reese, 107 Fed. 942, 47 C. C. A. 87, the United States Circuit Court of Ap *368 peals for this circuit had occasion to pass upon this identical question, and the rules there laid down are so clear and convincing that it is unnecessary for the court to refer to any other authorities on this subject. Judge Adams, who delivered the opinion of the court, there held:
“That contempt being a crime, it follows that one accused thereof must be tried on the charge made and no other, and hence one not a party nor bound by an injunctional order cannot be tried and convicted on a charge of contempt proceeding wholly on the theory that he was a party, bound by the order, and his commitment sustained on the ground that he was otherwise guilty in interfering with its enforcement.”
In that case Judge Adams calls attentions to the fact that:
“Reese was not charged in the motion for commitment with aiding, abetting, or assisting, or combining, confederating, or conspiring with the defendants, or either of them, nor was he charged with doing the acts complained of as their servant or agents.”
He then proceeds:
“It is entirely consonant with reason, and necessary to maintain the dignity, usefulness, and respect of a court, that any person, whether a party to a suit or not, having knowledge that a court of competent jurisdiction has ordered certain persons to do or abstain from doing certain acts, cannot intentionally interfere to thwart the purposes of the court in making such order. Such an act, independent' of its effect upon the rights of the suitors in the case, is a flagrant disrespect to the court which issues it, and an unwarrantable interference with, and obstruction to, the orderly and effective administration of justice, and as such is and ought to be treated as contempt of the court which issued the order.”
Among the cases cited by the learned judge in his opinion, and which throws considerable light on this question, is Wellesley v. Mornington, 11 Beav. 180, 181. There were two cases before the court. In the first case, reported on page 180, the motion was to commit for ■contempt for a breach of the injunction to which he was not a party, and the Master of the Rolls, Lord Langdale, held that the objection was fatal to this form of notice of motion, but he proceeds:
“But X by no means think that, because Batley is not enjoined in his character of servant and agent, he cannot be punished for knowingly aiding and assisting Lord Mornington in doing that which the court has expressly prohibited.”
Thereupon another motion was filed against Batley to commit him for contempt “in being party and privy to, and in aiding and assisting the breach of, the injunction which restrained the defendant from cutting timber; Batley at the time knowing that these acts were forbidden.” Upon these allegations being proved, the Master held it would have been his duty to commit Mr. Batley for his contempt in intermeddling with these matters, had it not been waived by the complainant.
As the motion in this case specifically charges that these parties, “having full knowledge and notice of the issuance of the said temporary restraining order and of the terms thereof, have aided, abetted, and assisted said defendants in so violating the same,” the court has undoubted jurisdiction in this proceeding, under the rule laid down in Re Reese, supra.
As there are a number of facts which are undisputed, it may be advisable to state them now before those facts as to which the evidence *369 is conflicting are reviewed. These undisputed facts are: That prior to the institution of this suit the district council of the United Brotherhood of Carpenters and Joiners, of St. Louis, had distributed and sent to contractors and builders certain circulars advising them of the employers in cabinet shops and planing mills who are recognized by the unions as “fair” to organized labor. One of the cards, dated January 1, 1903, is as follows:
“Carpenters’ District Council of the United Brotherhood of Carpenters and
Joiners of America.
“Office, 1306 Olive Street, Third Floor.- Kinloek ’Phone A209.
“St Louis, Mo., July 1, 1903.
“The following employers in cabinet shops and planing mills are recognized by Local No. 1100, 1596 and the C. D. C. as fair to organized labor, and we recommend them to our friends. Be sure and give no work to firms opposed to organized labor.”
Then follows a list of the firms, but that of complainant is not among them. The card then proceeds:
“All shops and planing mills not on this list in St. Louis and vicinity are classed as unfair, until further notice. All lists prior to July 1, 1903, are hereby canceled.”
The next in date is the following circular letter:
“Carpenters’ District Council of the United Brotherhood of Carpenters and
Joiners of America.
“Office, 1306 Olive Street, Third Floor.
“St. Louis, July 14, 1903.
“To All Contractors, Architects, and Owners—Dear Sir: On June 13, 1903, the management of the Broadway Planing Mill, known as the Charles A. Olcott Planing Mill, located at 3300 North Broadway, locked out all members of the United Brotherhood of Carpenters. On June 16th the Carpenters’ District Council decided to refuse to work on any building where the North Broadway mill furnished material of any description. Therefore, all contracts which have been or will be let after the above date, the carpenters will refuse to handle the material. This will apply to all unfair mills. A list of all union mills can be had by application to this organization.
“Yours, etc., Carpenters’ District Council,
“George C. Newman, Secretary.”
Another circular letter issued thereafter, but also before the institution of this action, is as follows:
“Carpenters’ District Council of the United Brotherhood of Carpenters and
Joiners of America.
“Office, 1306 Olive Street, Third Floor.
“To All Contractors, Builders, Architects, and Owners: On or about July 14, 1903, this council informed you of the fact that certain planing mills in St. Louis were unfair to this council and would furnish a list of such unfair mills on application to this council. And furthermore we furnished you with a list of planing mills, cabinet shops, and stair builders which were fair to this council, and asking you to patronize only such firms. These notices and lists in a great many cases have been ignored and no attention paid to them. Therefore, this council takes the liberty to inform you that our members will refuse to use any mill work furnished by any mill or shop that is unfair to this council. Below you will see a list of planing mills, cabinet shops, and stair builders rated as fair by this council.
“Respectfully, Carpenters’ District Council,
“George C. Newman, Secretary.”
*370 Then follow the names of 28 firms engaged in operating planing mills, cabinet shops, and stair builders, but the name of complainant is not among them.
After the granting of the injunction herein none of these, or similar circulars or lists, were sent out until shortly before the institution of these proceedings for contempt, when the circulars hereinafter set out were circulated. The only circulars published and circulated between the time of the granting of the injunction in this cause and those circulars hereinbefore set out were cards called “Steward Lists,” which merely contained a list of union cabinet shops, union stair builders, and union planing mills, but without any explanations or requests not to purchase supplies from firms-not on the list, nor any-threats of strike or boycott for purchasing material from such other firms. The name of complainant does not appear on these “Steward Lists.” In June, 1905, the district council requested the chief officers of the organization to send some one to St. Louis for the purpose of assisting them in organizing new unions and “straighten some matters oüt.” Thereupon the respondent Bohnen, who was one of the national organizers of the brotherhood, arrived there to assist in “unionizing” the mills. Shortly after the arrival of Bohnen, in August, 1905, a booklet was issued and circulated among all contractors and builders, having printed on the title page the following:
“List of St. Louis union mills and manufacturers of interior woodwork, decorations, stairs, trim parquet flooring, wood turning, stair, office, bank, and bar- fixtures. August, 1905. Subject to monthly correction.”
This booklet contained a list of all manufacturers of wood material in the city of St. Louis which were declared “fair”; the name of the complainant not appearing among them. On the first page of this booklet the following letter is printed:
“To Owners, Architects, Contractors, and Builders of St. Louis and Vicinity—Gentlemen: In order to avoid any labor trouble on jobs you are interested in, we deem it necessary to request you to stipulate in all your contracts a clause guarantying employment of recognized union men; also a clause requiring in the execution of all contracts for carpenter work the employment of union made trim mantels, parquet flooring and other shop made carpenter work. We desire to inform you that unless this material has been constructed under strict union conditions we shall refuse to handle it. It being a well-known fact that the agents of unfair and nonunion firms resort to misstatements in order to obtain contracts in this city, we recommend that before placing contracts with any firm not on this list you communicate with this organization regarding the union standing of said firm.
“We respectfully call your attention to the following firms, manufacturers of interior woodwork, etc., who are working under an agreement with this district council. This list is, however, subject to revision monthly, and contracts let therefrom will only be protected if let within the month for which the list is issued. Later lists can be obtained on application to James A. Shine, Secretary Carpenters’ District Council, 1306 Olive Street.”
In September, October, and November, 1905, booklets identical with that issued in August, with the exception of some slight changes in the list of firms and the month to indicate when it was issued, were published and circulated by the district council. In August, 1905, one of these booklets, the one published in August, was handed to Charleville, the contractor and builder mentioned in the motion for *371 the contempt proceedings, by the respondent Mellville, at a place where he was then erecting a building under contract. At the same time he was informed by Mellville that he (Charleville) was using “unfair” mill work, and that for this reason he would have to call his men off the building. Charleville remarked that this would ruin his business. Thereupon three other men came up whom he recognized as the defendant Shine and the respondents Bohnen and Crowe, and, after repeating what had been said to him about “unfair” material, an engagement was made for him to meet the council at its office on Olive street. There all the parties to this contempt proceeding were met by him, when he was informed by Bohnen that, if he would sign an agreement to buy only from “fair” mills, he would be permitted to finish the work without interference. A booklet was then handed to him, with the statement that it contained a list of the mills considered “fair” by the union, on which complainant’s name did not appear. .He thereupon signed the following contract:
“Articles of agreement made this seventeenth August, 1905, between B. J. Charleville, of the first part, and Carpenters’ District Council, of St. Louis and vicinity, of the United Brotherhood of Carpenters and Joiners of America, of the second part:
“Whereas, the party of the first part is desirous of employing carpenters belonging to the labor unions of the party of the second part at union rates of wages, and to have the name of the party of the first part in the list of union owners or contractors of the party of the second part; and
“Whereas, the party of the first part desires to obtain and use union made trim, meaning doors, mantels and other shop-made carpenter work, on such buildings or parts of buildings the party of the first part may have such materials used upon; and
“Whereas, the party of the second part consists of union carpenters whom it desires to have perform all the carpenter work required by the party of the first part at union rates of wages, and to have its members make all trim which may be required by the party of the first part:
“Now this agreement witnesseth, that in consideration of the sum of one dollar, by each party to the other paid, the receipt whereof is hereby acknowledged and in consideration of the party of the second part furnishing in a reasonable time after demand, except in case of strikes, all carpenters that may be required by the party of the first part on such work as the party of the first part may have to perform within the city’ and county of St. Louis within two years from the date of these presents and to furnish in a reasonable time after demand, except in case of strikes, such union carpenters as may be required for making trim which may be required by the party of the first part, all of said carpenters to agree to work at the union rates of wages prevailing at the time of said employment, and further in consideration of the party of the second part placing the name of the party of the first part in its list of union owners or contractors, the party of the first part hereby agrees during two years from the date of these presents to employ union carpenters exclusively and none other than union carpenters and to pay union rates of wages prevailing at the date of such employment of carpenters and to employ union trim in all buildings or repairing work which the party of the first part may do or cause to be done within the city and county of St Louis during two years from the date of these presents.
“And the party of the first part further agrees to insert or cause to be inserted in any contracts the party of the first part may give out during two years from the date of these presents for work within the city and county of St. Louis to be performed by carpenters, a clause or provision requiring m the execution of said contract or contracts, the employment of union carpenters at union rates of wages prevailing at’ the time of said employment and to have used or employed only union trim, made within the city or *372 county of St. Louis, or if not made in said city or county, to be made at St. Louis union rates of wages.
“This contract in all its parts is to run for the term of two years from the date hereof and is to apply only to work on, or trim used or intended to be used on buildings, or on parts of buildings within the city and county of St. Louis.
“And as a further consideration for this contract it is agreed that none of its terms as to trim are to apply to the following buildings now in course of construction, the contracts for the same having been let prior to the date of this agreement:
No. of Houses—1. Miss Ellen Gerahty, Chamberlain & Goodfellow Ave.
—5. Cleveland Realty & Improvement Co., Lafayette & Compton Ave.
—1. Dr. Walter Johnson, Grand & Flora Boulevard.
—1. Dr. E. P. Ward, Shenandoah & Oregon Ave.
—1. Mrs. Ida Graves, Hartford St. W. of Grand Ave.
—3. Finity Realty Co., Juniata, W. of Grand Ave.
—1. Jos. Duchik, Allen West of McNair Ave.
—1. Ernest Hoelke, Allen West of Mississippi Ave.
—2. Geo. Feltrop, Magnolia & Vandeventer Ave.
—1. Mark N. Little, 3653 Russell & Spring Ave.
—1. A. Bronk, N. S. Russell, W. of McNair Ave.
—1. Miss E. Weber, Illinois and Potomac Sts.
-2. Henry Schwinker, Longfellow & Geyer.
“In testimony August, 1905. whereof, witness, our hands and seals this 17th day B. J. Charleville, “Jas. A. Shine, of
“For Carpenters’ District Council of St. Louis and Vicinity. “State of Missouri, City of St. Louis—ss.:
“On this 17th day of August, 1905, before me personally appeared B. J. Charleville and James Shine, the latter secretary and agent of Carpenters’ District Council of St. Louis and vicinity, and both to me being personally known, acknowledged the above and foregoing instrument as their free act and deed, and the said Shine declared himself as acting by and with authority of the said district council.
“In testimony whereof I have hereunto affixed my seal and signature at my office in St. Louis the day and year last above mentioned.
“[Seal.] Jno. B. Dempsey, Notary Public.
“My term expires Aug. 4/06.”
The evidence hereinbefore quoted is practically undisputed. To set out the other testimony in this case, which is very voluminous, would serve no useful purpose. Nor is it necessary to set out in this opinion the findings of facts made by the master and the exceptions thereto, as the court, in view of the important issues in this case, has carefully read over all the testimony and made its own findings of facts, aided by the master’s findings, which have been given that consideration which they are entitled to, under the well-settled rules of law governing the effect that will be given to the findings of a master who has had an opportunity to hear the witnesses testify orally and seeing their demeanor while so doing. Nor is it necessary for the court in this proceeding to determine the measure of proof applicable to cases of this character, whether it need only be dear and convincing, or whether it must be sufficient to convince beyond a reasonable doubt, as the findings made by the court are established by proofs which satisfy the court beyond a-reasonable doubt.
The court finds that the defendants Shine and Hohenstein were *373 parties to the original proceedings and had actual notice of the restraining order, and that the other respondents, although not parties to the original proceedings, nor included in or served with a copy of the restraining order, had actual knowledge thereof before July 1, 1905; that the booklets issued in August, September, and October, 1905, containing lists of St. Louis union mills, etc., hereinbefore given in full, were distributed among the contractors and builders of St. Louis generally during the months for which they were issued by or under the direction of all the parties to this proceeding, and that in none of these booklets or lists did anything appear to indicate that complainant was exempt from the prohibitions to use materials from manufacturers of building materials whose names did not appear on those lists and which were classed as “unfair”; that from the time the restraining order was issued until August, 1905, which was after the arrival in St. Louis of Bohnen, who came there as one of the national organizers of the Brotherhood of Carpenters and Joiners, no circulars or notices of any kind were sent out by any of the respondents of defendants in the original suit containing any warnings that any materials purchased from mills or manufacturers whose names did not appear on any of the lists issued by the council would not be handled by members of the union; that, whenever inquiries were made of either of the respondents whether complainant’s materials were included in the prohibition of the council, the inquirers were advised that the members of the council, being under a restraining order of this court enjoining them from interfering with the products of complainant, the prohibitions or threats contained in their lists or circulars did not apply to it, but that before the institution of these proceedings for contempt this fact was not made known to any of the builders or contractors in the circulars or booklets issued by defendants, nor otherwise communicated to them, except when specially interrogated on the subject; that before and at the time of the execution of the contract between Charleville and the council, which contract has been set out in full in this opinion, Charleville was not informed that the prohibitions contained therein did not apply to complainant, but thereafter, when respondents were informed by Charleville that he was using at one of his buildings material purchased from complainant, that information was imparted to him; that the contract between Charleville and the district council was entered into by Charleville solely by reason of his fears, founded upon statements made by the respondents, which, under the peculiar circumstances then existing, amounted to threats of a strike unless he obligated himself not to use any materials manufactured by mills not on the council’s lists as “union mills”; that when the August, 1905, booklet was handed by respondents to the Fisher Company (A. A. Fisher Architectural & Building Company), no notice was given to them that the complainant, whose name did not appear thereon, was exempted from the prohibitions contained therein, but that such notice was only communicated to them after the institution of these proceedings for contempt; that the respondents endeavored to induce the Fisher Company to enter with them into a contract similar to that entered into by Charleville, and that no mention *374 was made to him at that time of the fact that, owing to the restraining order issued in this case, material purchased from complainant could be used by it without a violation of the terms of the contract; that at that time the Fisher Company was not using any materials manufactured by complainant, but that in purchasing materials it would qall for bids from many mills and purchase from the one offering the material at the lowest price, regardless of whether it was a union mill or not; that in August, 1905, Beckmeyer & Schroeder, contractors, were handed a copy of the August booklet by one of the agents of the council, in the presence of the respondents Hohenstein, Shine, Bohnen, and Crowe, at the place where he was then engaged in erecting a house with union carpenters, and he was then notified that the union men would be withdrawn because he was handling material from the mill of Fox Bros., an “unfair” mill and not on the council’s list; thereafter, in order to carry out their contracts, they entered into a contract similar to that of Charleville without any notice from respondents that complainant, whose name was not on the list, was not included among those mills from whom he must not purchase material.
. At the hearing before the master objections were made to the admission of the evidence of Beckmeyer in relation to the interference of respondents with the building contracts of. his firm. The objections were based upon two grounds: First, that the firm did not handle any of complainants materials at that time; second, that in the petition for these proceedings that transaction is not mentioned. Objections were also made to the admission of Fisher’s testimony upon the ground that at that time he did not handle any of complainant’s materials.
■ It may be assumed that in a proceeding of this kind a party cited for contempt cannot be found guilty for any other violations of an injunction than those specifically set forth in the motion or petition, which should be treated as an information in a criminal proceeding; and it may also be assumed that a person cannot be guilty of a violation of a restraining order such as was issued in this case by interfering with one who does not deal with the party in whose behalf the order was granted. Still, the evidence objected to is admissible for the reason that it tends to prove the intent of the parties, which must be established in order to justify a finding of guilty, and upon the further ground that the restraining order in this case enjoined defendants from “giving notice, verbal or written, to any person, firm, or corporation to decline to purchase materials of any sort from complainant under threats that if such purchases are made they will cause persons in the employ of persons thus notified to withdraw from their service.”
As shown by the testimony of Fisher, and common sense would naturally suggest it without any direct testimony to that effect, contractors would buy their material at the lowest price possible, and would for this reason solicit bids from a number of manufacturers. It would be nothing unusual for mills to obtain contracts as the lowest bidders at one time and be unsuccessful at other times. In the absence of an effective “boycott,” complainant might be able to ob *375 tain in 1906 contracts as the lowest bidder from builders and contractors who in 1905 were able to purchase cheaper from others, but, if contractors could be prevented from dealing with certain manufacturers under any and all circumstances, all opportunity to obtain contracts would be effectively denied to them. It would be a sad commentary on the courts of justice if parties under injunction could indirectly do those things which they are restrained from doing, and yet be not subject to punishment for violating the injunction, because they only violated the spirit of the order of the. court and not its letter. This is not the law. 16 Am. & Eng. Enc. of Law (2d Ed.) 437. The language used in the restraining order is too plain to leave any doubt in the mind of any one as to what was intended to be accomplished. It shows clearly that its object was to protect, complainant not only from interference with its then customers, but any others who might in the future desire to deal with it. Upon these grounds the evidence was clearly admissible, and has been considered by the court in making its findings of facts.
Do the facts found by the court constitute a violation of the restraining order in this case?
The granting of the restraining order, and thereafter the refusal of the court to dissolve it, were judicial determinations that the concerted action of this organization in attempting to compel manufacturers to “unionize” their business, and to effect such purpose by sending out circulars threatening parties who purchase the products of complainant with strikes, is unlawful and should be enjoined. As long as the injunction is in force, it is the duty of every one to obey it implicitly, and any violation thereof by direct or indirect methods is a violation of the order of the court, which must be promptly put an end to, or it will bring the courts into contempt. These principles of law are elementary and require no citation of authorities. What would be the object of appealing to the courts for redress if its orders could, without fear of punishment, be disregarded? .It is a mistaken idea to suppose that parties can resort to subterfuges and thereby successfully evade the orders of a court of justice.
As found by the master, as well as the court, defendants, for more than 15 months after the granting of the restraining order, abstained from sending out any circulars threatening contractors and builders who' should use materials bought from mills not on these lists and therefore to be classed as “unfair to labor” with strikes or refusals on the part of its members to handle such material. This compliance and obedience to the order of the court shows conclusively that the defendants understood and knew the meaning and object of the restraining order. Evidently some of the members of the council were dissatisfied with this condition, but, instead of appealing to the court for a modification of its order, or appealing to a higher court, which, under the acts of Congress, might have been done without waiting for a final decree, and upon such appeal could have secured a speedy hearing, as the act specially provides that such appeals “shall take precedence in the appellate court” (Act Feb. 18, 1895, c. 96, 28 Stat. 666, [U. S. Comp. St. 1901, p. 550]), they applied to the chief officers of their organization for aid and advice to enable them to carry out *376 the objects which this court had restrained them from seeking to accomplish. It was for that purpose that Bohnen, one of the national organizers, came from New York to St. Louis in June, 1905. After remaining a few days he left the city, returning in July, and almost immediately thereafter the August booklet was circulated among the contractors and builders of St. Louis. No one will contend for a moment that these booklets were not for all practical purposes the same as the circulars sent out by the defendants prior to the institution of this action, .and the circulation of which was restrained by the court. These booklets contained a list of the firms and dealers who were working under an agreement with the district council and a notice that any material not constructed under strict union conditions would not be handled by members of that union. As the lists in these booklets comprise all the firms whose materials may be handled without danger of a strike, it follows as of course that all firms engaged in the manufacture of these articles in St. Louis whose names are not therein mentioned are “unfair,” and that their products will not be handled by union artisans.
All of the respondents participated, not only in publishing and circulating these booklets, but in attempting to induce contractors and builders to comply with their requests by entering into solemn contracts not to use any material from any but union firms, which, of course, excluded complainant, as its name did not appear on any of the lists.
The only defense attempted is that verbal notice was always given by the respondents to the contractors and builders that, owing to the injunction issued in this cause, complainant was not included among the “unfair” firms, and dealings with it would not be punished with a refusal to handle its material by union men. But the evidence establishes beyond a reasonable doubt that this fact was never mentioned to any contractor or builder unless he made special inquiry on the subject. Is it reasonable to suppose that every one of the several hundred contractors, builders, owners, and architects to whom these booklets were sent would make such inquiry about this particular firm, when there are many others engaged in the same business whose names did not appear on the council’s lists and for this reason are supposed to be “unfair”? If any of the contractors, builders, architects, or owners to whom these booklets were sent had been advised that complainant was not included, without their making special inquiry on the subject, it would have been an easy matter to have produced them as witnesses. If the intention of respondents was to obey the mandate of the court—not only its letter, but its 'spirit—it would have been a very easy matter to have inserted the facts relating to complainant in their circulars or booklets. Their failure to do so must satisfy any reasonable person that the respondents violated the order of the court, and did it after calm and due deliberation.
For these reasons, the findings of the master that all of the respondents are guilty of violating the restraining order issued in this case must be affirmed.