### WELLER v. WOLF et al.
#### No. 5138.

Court of Appeals of District of Columbia.
June 1, 1931.

Leo P. Harlow, of Washington, D. C., for appellant.

William L. Houston, Alexander Wolf, Wm. B. Wolf, Simon Fleishman, and Charles H. Houston, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB and GRONER, Associate Justices.

ROBB, Associate Justice.

Appeal from a decree in the Supreme Court of the District overruling exceptions by appellant to a special master's report disallowing appellant's claim against the assets of the New Masonic Hall Corporation.

In December, 1918, there was incorporated the New Masonic Hall Corporation for the purpose of acquiring, providing, and furnishing a suitable building in the District of Columbia for the use and accommodation of several branches of the Masonic Order (colored). The corporation acquired real estate located at Tenth and U streets, in this city, commenced the construction of a building, became financially embarrassed, and on April 15, 1926, a bill was filed to dissolve it. By decree dated November 3, 1927, the corporation was dissolved, and receivers appointed to collect the assets.

Thereafter, on August 6, 1928, the cause was referred to the special master to state the account of the receivers, the order of reference directing, inter alia, "that he report his findings upon the claims presented by creditors and stockholders, both common and preferred, against the New Masonic Hall Corporation, or against the Receivers in this cause." On September 17, 1929, the special master made his report, in which he found appellant's claim to be "without merit," and therefore rejected it. Appellant filed exceptions to the report, contending that it "is contrary to the evidence and to the weight of the evidence adduced in support of said claim."

Appellant's claim was filed March 24, 1927, and alleges that on the 23d day of April, 1925, he was solicited by officers and directors of the New Masonic Hall Corporation "to assist * * * in the financing and construction of a certain building then in course of erection" by the corporation; that he undertook, in good faith, to assist "in the financing and construction of said building * * * and did procure the agreement of the Weller Construction Company, a corporation doing business in the District of Columbia, to subscribe to twenty per cent (20%) of the first trust loan proposed to be made on the said building, which agreement, and deponent's recommendation, were instrumental in obtaining the approval of the firm of Glover and Flather, real estate brokers of the District of Columbia, of the application of the New Masonic Hall Corporation for a First Trust loan of one hundred and twenty-five thousand dollars ($125,000.00) on the said building"; that appellant also rendered service in endeavoring to arrange a second trust loan on the building, and in other ways

endeavored to assist the corporation in the financing and construction of the building; that his services were of the value "of at least Two Thousand Five Hundred Dollars."

Appellant, Mr. Weller, a building contractor and engineer, testified that he first came in business contact with the corporation in the latter part of 1921, through the architects, who asked him if he "would care to help build this building and finance it." Almost immediately thereafter, he met Mr. Mitchell, the president of the corporation. As a result of these interviews, he took the building plans and, after consulting several institutions in Washington, made several trips to New York, trying to negotiate a bond issue, but was unsuccessful in obtaining it; made trips to Philadelphia and also to Baltimore on the same mission; paid his own expenses, and has never been reimbursed. In 1922 he suggested modifying the building plans. "Following that, the matter passed out of my hands from that time until possibly a year or two years ago, about two years ago, (1925) and Mr. Mitchell again approached me, and Captain Gore also, to see what we could do towards financing the building." Appellant and Gore thereupon negotiated with Glover & Flather for a first trust of $125,000, of which appellant and Gore were to subscribe for $25,000 themselves. In order to obtain this loan, Glover & Flather had to be convinced that the building would be completed. "The subsequent law suit, however, threw things in a terrible mess, and that is where the proposition finally stood on the appointment of the committee of the Court when we tried to evolve schemes for going ahead with the completion of the building, all of which were unsuccessful, and the building was sold."

The witness was asked whether Glover & Flather's commitment to make the loan was based on any services performed by him, and he replied, "Yes, entirely based on assurances that I was going to be the contractor, and that the money was to be paid directly to the contractor by them, on the authorization of the architect or committee." The witness was asked, "what, if any understanding, verbal or otherwise," he had with the company (corporation) with regard to compensation or reimbursement, and answered: "I had a verbal understanding, whether or not it is in the record I do not know, that my compensation, in the event of my building, was a builder's profit, and, in the event of obtaining the finances, my compensation would be that, and

in the event of all negotiations failing, I was to be reimbursed for my services and expenses at a fair and reasonable rate." Asked the date of this verbal understanding, witness replied: "This was made when we first started in 1921. It was the understanding, in the event of my building the building, that my commission and charges would be absorbed in that—my expenses in obtaining the loan and expenses I had been put to. In the event of only obtaining the loan, I would have compensation for that; also, in the event of the entire plan falling through, I was to be reimbursed for my expenses and the time I spent on it—a reasonable charge." That this agreement was made "at the very beginning, when I was doing all this traveling." Asked whether that was before "they began to build," witness replied, "Yes, in 1921," and that he "never made any charge until now." The witness was also asked to state the amount of his expenses, and replied that it was hard at that date to itemize them.

Jesse H. Mitchell, president of the corporation in 1921 and subsequently, testified that he was "familiar with the fact of Mr. Weller having come into business contact with the Association, in regard to erecting the new building, in about 1921," and, as a result of interviews with Mr. Weller, went over the building plans and figured plans on the cost of changes "and the cost of construction as the plans were originally drawn. He (Weller) went so far as to get some bids from sub-contractors, in order to determine what the cost of construction would be, and in order to check up on him, I independently got bids from other Construction Companies; Lipscomb Company, the Fuller Construction Company and several others, and I may say now that his bid was the best we were able to obtain."

Witness was asked: "What, if any, understanding did Mr. Weller have with the Company in connection with the work that he did for it?" He replied: "The general understanding of the Board of Directors was that no man would work and give his services for nothing. We did not expect it, in the first place, and, in order to interest Mr. Weller, we made the proposition to him that we would expect to pay him for his time and labor, and we had a gentleman's agreement that his charge for services would be fair and reasonable if he failed to obtain the loan; if successful, naturally his compensation would be obtained by his profits in the construction of the building." The witness, upon being

asked what period of time was covered by his interviews with Weller, answered: "From some time in the Spring of 1921 until the Spring of 1925, covering a period of four years."

The only minutes of the board of directors introduced in evidence and having any possible pertinency were the minutes of July 26, 1923, which "authorized the committee to negotiate the loan."

In Hutchins v. Munn, 209 U. S. 246, 250, 28 S. Ct. 504, 506, 52 L. Ed. 776, affirming 28 App. D. C. 271, the court said: "The appellants alleged various exceptions to the auditor's report, which are directed to the findings of facts upon which the liability was based and of the amount of damages, and here, apparently, argue those exceptions on the theory that this court is at liberty to consider the evidence de novo, weigh and balance it, and draw such inferences and conclusions as seem proper. But this theory overlooks the proper function of an auditor, which was correctly appreciated by the court below. The findings should not be set aside unless it is shown that there has been an error in law or a conclusion of fact unwarranted by the evidence." See, also, Dillman v. Hastings, 144 U. S. 136, 12 S. Ct. 662, 36 L. Ed. 378; Davis v. Schwartz, 155 U. S. 631, 15 S. Ct. 237, 39 L. Ed. 289; Smith v. Trust Co., 12 App. D. C. 192.

An auditor or master, like a jury, has the advantage of hearing the testimony and of observing the demeanor of the witnesses on the stand. Huttig Sash & Door Co. v. Fuelle (C. C.) 143 F. 363; Des Moines Water Co. v. City of Des Moines (C. C.) 192 F. 193.

Was the finding of the master in this case "unwarranted by the evidence"? Mr. Weller was a building contractor, and it is apparent from the evidence that his primary interest was to finance the enterprise that he might construct the building. It is significant that although he testified that he had a "verbal understanding" as to compensation in 1921, his verified claim states the date as of April, 1925. It is further significant that he kept no account of his expenditures, although he testified that he always expected to be reimbursed. He was particularly active in 1921 and 1922, but permitted the matter to pass out of his hands until 1925, and filed no claim until 1927. Having in mind the functions of an auditor or master and the limitations of a reviewing tribunal, we conclude, without further analysis of the evidence, that the master's report was not unwarranted.

The decree, therefore, is affirmed, with costs.

Affirmed.