NORTHERN TRUST CO. OF CHICAGO v. EDENBORN. *

MANN v. SAME.

No. 8705.

Circuit Court of Appeals, Fifth Circuit.

Aug. 18, 1938.

*Rehearing denied Oct. 28, 1938.

658

Sidney L. Herold and Overton Brooks, both of Shreveport, La., for appellants Northern Trust Co. of Chicago and August Mann.

A. B. Freyer, of Shreveport, La., and R. C. Milling, of New Orleans, La., for appellee Sarah Drain Edenborn.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

These suits present identical issues and were consolidated and tried together. One suit was brought by August Mann, the other by Mrs. Lena Mann Wigton, for whom the Northern Trust Co., as her executor, had been substituted. The suits were brought to set aside, on the ground of fraud, an agreement made between plaintiffs, heirs at law of William Edenborn, and Sarah Edenborn, his widow, in settlement of their rights in the estate of William Edenborn, and also to have declared void a judgment of a probate court putting Mrs. Edenborn in possession of the entire estate. The appeals are from judgments dismissing the bills. On a former appeal we reversed a judgment granting interlocutory orders impounding certain assets of the estate which plaintiffs alleged should be considered held in trust for them by Mrs. Edenborn, and enjoining her from disposing of same during the pendency of the litigation. The merits were not passed upon in that case. Edenborn v. Wigton, 5 Cir., 74 F.2d 374. The record contains 1,600 printed pages. There are 36 assignments of error. In the view we take of the case, it is unnecessary to discuss either the facts or the assignments extensively.

Undisputed facts are these. William Edenborn was married to Sarah Drain in St. Louis in 1876. His property was inconsiderable at that time. He resided in Missouri for a while, then moved to Illinois and later to New York, where he was living when he came to Louisiana in 1907 and established his domicile. He was then worth approximately $10,000,000. Prior to 1900 he had made large investments in Louisiana. At his death he also owned property in Arkansas, Alabama and Missouri. He died, intestate, in Shreveport, Louisiana, where he then resided, on May 14, 1926. He left surviving him his widow in community and as next of kin, two nephews and two nieces, children of a deceased sister, to-wit, August and Otto Mann, Mrs. Lena Wigton and Mrs. Emma Logan. He left no legitimate ascendents or descendents. Under the law of Louisiana his widow in community owned one-half of the community property in her own right and inherited the other half to the exclusion of the collateral heirs, who in turn inherited all his separate property to the exclusion of the widow, except as to rights of dower in property in states other than Louisiana. On May 17, 1926, three days after his death, a meeting was held in William Edenborn's office in Shreveport, which was attended by his widow, R. E. Milling, Sr. and E. H. Randolph, two personal friends of Edenborn and who had been his attorneys for years, A. B. Freyer and Allen Rendall, law partners of Ran-

dolph, his nephews, August and Otto Mann, and E. A. Staman and Paul Sippel, all employees of Edenborn. August Mann represented his sisters, Mrs. Wigton and Mrs. Logan. The conference continued for about four days and on May 20, 1926, a written agreement was entered into by which the nephews and nieces agreed to each accept four per cent of the entire estate, community as well as separate, in settlement of their rights. The material part of the agreement is as follows:

"Whereas Mrs. Edenborn, his wife, has under the laws of Louisiana inherited his interest in all the community estate and has made application to the Court to be recognized as heir and placed in possession of the entire estate of whatever it consists.

"Now, therefore: In consideration of the premises and other good and valuable considerations, the above named nephews and nieces agree with Mrs. Edenborn that upon her carrying out the provisions expressed, under the will made by Mr. Edenbern, dated at St. Louis, June 30, 1908, and afterwards revoked by him, that is to pay out of the succession each of the above named nephews and nieces four (4%) per cent, of the entire amount of the succession, and also pay to the wife of William Mann two (2%) per cent., and that they will and do hereby, when the said payment is made, release and relinquish any and all claims which they have to any inheritance in the succession of said William Edenborn and assign and transfer to her any and all such claims and relieve the succession from any claims whatever, and in addition thereto transfer to her all right, title, interest, claims and demands which they have against the succession of the said William Edenborn and in and to all the property in which they may have inherited an interest; and they further agree that they will join her in any legal proceedings for the purpose of placing her in possession of any property belonging to the succession and will sign any and all deeds of any nature whatever that may be necessary to fully vest in her the title and ownership to said succession and property thereof.

"It is understood and agreed between the parties, however, that as Mrs. Edenborn has not yet been recognized by judgment of the Court as widow in community and the owner by inheritance to one half of the community property, and owner of the other half in her own right, and as a great bulk of the estate is represented by the ownership in the stocks and bonds of the railroads of the Louisiana Railway & Navigation Company and the Louisiana Railway & Navigation Company of Texas, it is distinctly agreed and understood that this obligation shall not be enforcible until such time as these railroads can either be leased or sold or improved and put in condition that its securities will be listed upon the market and sold, or some disposition made of the property either by converting same into money or liquid assets which will be readily converted into money and until such time these percentages of the estate will not be required to be ascertained and delivered to the nephews and nieces and the parties herein named; and it is further understood also that Mrs. Edenborn will use the assets of the estate for the purpose of bringing about this improvement or liquidation of the railroad, and if in so doing money is lost and the estate is diminished by such operation or handling of the property, she will only be answerable for the percent. herein named of whatever remains of the estate after such liquidation and improvements, sale or other disposition thereof.

"Thus done and signed by us in duplicate on this 20th day of May, 1926."

Mrs. Wigton and Mrs. Logan were then in St. Louis. August Mann took the agreement to St. Louis and secured the signatures of his sisters. After that Otto Mann was appointed by Mrs. Edenborn as her agent. On May 18, 1926, the day after the conference started, Mrs. Edenborn, through the same attorneys who attended the conference, opened the succession of William Edenborn in the district court of Caddo Parish, in which Shreveport is located, and applied for the taking of inventories, alleging that all the property of which William Edenborn died possessed was community property. Inventories were taken, were approved by the heirs and on June 18, 1925, Mrs. Edenborn was put in possession of the entire estate by a judgment of the state court, which, however, recited that the rights of the heirs to claim any part of the estate as separate property were reserved. The estate was finally liquidated and on June 14, 1929, Mrs. Edenborn made settlement with plaintiffs and with Otto Mann and Mrs. Logan in accordance with the agreement, giving them each cash and securities of par value

to the amount of $334,756 which, with the payment to the widow of William Mann, amounted to a total of $1,507,402. Plaintiffs and the other heirs accepted payments and signed receipts, concurrently transferring to Mrs. Edenborn the property in Arkansas, Alabama and Missouri. So far as necessary to quote, the receipts are as follows:

"I, the undersigned, hereby acknowledge to have received from Mrs. Sarah Edenborn:

"1. (Certain Securities Described.)

"2. (Certain Securities Described.)

"3. Check payable to my order for the sum of one hundred and fifty four thousand, seven hundred and fifty six and no/100 ($154,756.00) dollars.

"Said check and securities are accepted by me in full settlement of any right, title, interest, claim or demand which I have or may have in and to the estate, property, real and personal, rights, choses of action, or any other property wherever situated, belonging to or standing in the name of William or Sarah Edenborn and or of which the said William Edenborn died possessed, both by reason of the operation of law and by the terms of the agreement of May 20, 1926, between Mrs. Sarah Edenborn and the undersigned.

"Except that it is understood and agreed that in arriving at the amount of the settlement made there has been deducted and set aside in cash and property the sum of two million and forty thousand, four hundred and ninety-five and 81/100 ($2,040,-495.81) dollars, for the final payment, compromise and adjustment of Estate and Inheritance taxes, claims against the Louisiana Railway & Navigation Company, for which the said Mrs. Sarah Edenborn or the succession of William Edenborn may in any manner be liable, and all other claims or contingencies in connection with the succession of said William Edenborn and/or the inheritance thereof by the said Mrs. Sarah Edenborn, and that upon the final payment, compromise and adjustment of all of said taxes, claims and contingencies there shall be paid to me out of any amount of the principal sum of two million and forty thousand, four hundred ninety-five and 81/100 ($2,040,495.81) dollars remaining in the hands of the said Mrs. Sarah Edenborn an amount equal to four (4%) of said remainder, that Mrs. Edenborn shall pay out of said amount reserved, all claims, including costs, and attorneys fees, if any, for which she or the undersigned may be liable.

"Shreveport, Louisiana, June 14th, 1929."

These suits and similar suits in a state court by Otto Mann and Mrs. Logan were filed in January, 1933, more than three and a half years after the final settlement and more than six and a half years after the agreement was made.

On the ground of fraud, the bills, in substance, alleged that plaintiffs made the agreement through error and mistake, in ignorance of their rights, as the result of erroneous advice, upon which they relied, given by attorneys who represented both plaintiffs and defendant. The bills also alleged that the separate estate of William Edenborn amounted to more than $8,000,000 and the community estate was less than $2,000,000; and that the community estate was heavily indebted to the separate estate. In the alternative they asked that this amount be ascertained and that they be adjudged to be creditors of the community estate. By amended bills they asked that the agreement be set aside as unconscionable, in the event it was not found to have been procured by fraud. After the evidence had been taken and the case set down for argument, plaintiffs offered second amended bills, in which they alleged they were entitled to rescind the agreement for lesion. Leave to file these second amended bills were denied. The district court concluded that the agreement was not procured by fraud and that it was unnecessary to decide the other issues presented by plaintiffs.

The basis of the charge of fraud is advice attributed to R. E. Milling, Sr., and E. H. Randolph to the effect that all the estate left by William Edenborn was in fact community property which the widow would inherit to the exclusion of plaintiffs as collateral heirs.

As instances tending to prove the charge of fraud, plaintiffs argue that by representing both sides; by giving erroneous advice to them; by alleging that all the property was community property in petitioning the state court to open the succession; and by not making full disclosures to them, the attorneys were guilty of unethical practice, in violation of the canons of the American Bar Association.

In support of this they rely upon the case of Parkerson v. Borst, 5 Cir., 264 F. 761, 765.

The facts pertaining to the making of the agreement of May 20, 1926, as found by the district court and supported by the record, are these. The conference opened on June 14, 1926, the affairs of William Edenborn were discussed and his papers were examined. A cancelled will and a memorandum for a new will, which he had never executed, were found. These indicated he had intended leaving to Otto Mann, Mrs. Wigton, and the widow of William Mann, each two per cent of his estate, and to August Mann and Mrs. Logan each four per cent of his estate. The principal asset was a railroad chartered under the name of Louisiana Railway & Navigation Co., extending from New Orleans to Shreveport, and later into Texas. William Edenborn had begun the construction of this road before he came to Louisiana to live, through a construction company, of which he owned all the stock. Edenborn advanced all the money necessary to build the road. It was paid for by an issue of bonds given to the construction company and these Edenborn received. Edenborn owned all the outstanding stock and bonds of the railroad. It never earned dividends or fixed charges. From time to time William Edenborn advanced the money necessary to keep the road running. Shortly prior to his death he began extensive improvements on the road, straightening out and relocating part of the lines and building a bridge over the Atchafalaya River. The improvements under way would cost approximately $2,000,000. Of this William Edenborn had paid between $500,000 and $600,000 before his death and was obligated to pay the balance. With the death of William Edenborn the road was in a precarious condition. Its value as an asset was doubtful. To give it any reasonable going concern value it was necessary to complete the road. This was recognized by all parties to the conference and is reflected in the written agreement signed. It was agreed that Mrs. Edenborn should be put in possession of the entire estate and should take steps to complete the improvements and then dispose of the road. After she was put in possession of the estate Mrs. Edenborn completed the improvements on the road at a cost to her of over $1,570,000, paid the costs of the succession and attorneys' fees, paid the

state inheritance taxes and compromised certain litigation in St. Louis, in which a share of the estate was demanded and to which suit plaintiffs made themselves parties, in effect as defendants, paying out more than $300,000 in settlement of that litigation. She subsequently compromised and paid the federal estate taxes, paying about $430,900.

The district court heard the testimony of all the parties who were present at any time at the conference preceding the agreement of May 20th, 1926, except that of E. H. Randolph, who had died in the meantime. However, an affidavit made by him was admitted in evidence. R. E. Milling, Sr. testified, in substance, that he stated that Mrs. Edenborn would be the owner of one-half of the community property and would inherit the other one-half; that the presumption of law was that all the property William Edenborn died possessed of in Louisiana was community property but the presumption could be overcome by showing that any particular piece of property or any part of it was his separate property. This is a correct statement of the law of Louisiana. Civil Code, Article 915 (as amended by Act 57 of 1910) and Articles 2405 and 2287. He was corroborated as to this statement by the affidavit of E. H. Randolph and by all the other witnesses, except Otto Mann and August Mann, who testified, in substance, that Milling stated positively that all the property of which William Edenborn died possessed was in fact community property and would be inherited by Mrs. Edenborn. The district court found that the statement made was that testified to by Milling. His conclusion resolving the conflict in the evidence is entitled to great weight. Davis v. Schwartz, 155 U.S. 631-636, 15 S.Ct. 237, 39 L.Ed. 289. Furthermore, it may be presumed that August and Otto Mann were in the confidence of William Edenborn and knew as much about his business affairs as did his lawyers. They were mature men of business experience and had ample time to consult other counsel while the discussion was going on. The first paragraph of the agreement indicates they knew there was a separate estate that Mrs. Edenborn would not inherit. We concur in the findings of the district court on this point.

Nor do we find that the attorneys present at the conference were guilty of unethical practice. There was no con-

662

troversy at that time between the widow and next of kin. The conference was friendly and everyone was trying to work out a solution of the problems confronting them for the best interests of all parties. The opening of the succession was a routine proceeding. Alleging that all the property was community property is not unusual in similar cases. It was justified by the presumption created by law and the intent of all the parties. It could not have deceived plaintiffs. The case of Parkerson v. Borst, supra, is not in point.

■■ The second amended bills sought to interject the issue of lesion into the case. Lesion, as defined by the Louisiana Civil Code, Art. 1860, is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy is founded upon its being the effect of implied error or imposition. Since lesion does not depend upon actual fraud the amended bills, if allowed, would have materially changed the issues. They could not be considered trial amendments. Allowance of an amended bill is within the sound discretion of the trial judge. General Inv. Co. v. Lake Shore Ry. Co., 260 U.S. 261–281, 43 S.Ct. 106–114, 67 L.Ed. 244. We find no abuse of discretion in the action of the district judge in declining to receive the second amended bills.

■ We will not discuss the technical arguments of the parties set forth in their voluminous briefs of more than 200 pages each. Equity deals with substance, not technicalities. It is immaterial whether the agreement be called a compromise or something else. It certainly was not a sale or the partition of an estate. The contract resulting from the conference was a sensible working agreement, entered into in good faith, for the benefit of all the parties. In determining whether adequate consideration was given to plaintiffs we must consider the situation as it existed when the agreement was made. On this point it is contended by plaintiffs that the document signed on May 20, 1926, was merely preliminary and the agreement must be construed entirely by reference to the receipts given on June 14, 1929. This contention is untenable. On the contrary, the agreement of May 20, 1926, was complete in itself. It would have been executed by the payments received, although no receipts had at that time been signed. The most that can be said in favor of the con-

tention is that the documents may be construed together. Plaintiffs alleged in their bills that the separate estate was approximately $8,000,000 and the community estate was approximately $2,000,000. This allegation was made long after the estate had been liquidated. There is evidence in the record tending to show that the estates were of about equal value. However, $10,000,000 is far greater than the actual value of the total estate when the agreement was entered into. There is substantial evidence tending to show that in addition to the $1,500,000, in round figures, that Mrs. Edenborn paid to plaintiffs, their brother and sister, and the widow of William Mann, she expended at least $3,000,000 for the benefit of the separate estate, allocating her expenditures on the basis of 80 per cent to that estate. There is no reasonable basis for the contention that plaintiffs parted with their rights for a vile price, in the absence of fraud, or that the agreement was subject to rescission on the ground of lesion.

We agree with the district judge that it was unnecessary to determine what debt, if any, was owed by the community estate to the separate estate or to fix the value of either estate.

The record presents no reversible error.

The judgments are affirmed.