PONDER, Justice.
 

 These two consolidated cases were submitted in the trial court on a record made up in the United States District Court for the Western District of Louisiana, Shreveport Division, in similar suits brought by August Mann and Mrs. Lena Mann Wigton, who had since died and for whom her executor, the Northern Trust Company, had been substituted, against the defendant herein, Mrs. Sarah Drain Eden-born, with the exception of the testimony of an attorney and some documentary evidence.
 

 It appears that August Mann, E. Otto> Mann, Mrs. Lena Mann Wigton and Mrs. Emma Mann Logan were brothers and sisters and the nieces and nephews of William Edenborn, deceased. Mrs. Sarah Eden-born is the surviving spouse of William Edenborn, deceased. Four suits involving the same issues were instituted by these nieces and nephews of William Edenborn against the present defendant; two in the federal district court and two in the first judicial district court of this State in Caddo Parish. The suits brought in the federal district court by August Mann and Mrs. Wigton against the defendant herein were decided adverse to the plaintiffs and on appeal to the United States Circuit Court of Appeals, Fifth Circuit, affirmed. Northern Trust Co. of Chicago v. Edenborn, 5 Cir.,
 
 98
 
 F.2d 657. The present suits were decided adverse to the plaintiffs and they have appealed.
 

 William Edenborn was married to Sarah Drain in St. Louis in 1876. He owned very little property at that time. At different times thereafter he resided in Missouri, Illinois and in New York. He came to Louisiana in 1907 and established his domicile in this State at which time he was worth approximately $10,000,000. Prior
 
 *291
 
 to that time he had made large investments in this State. He died, intestate, at Shreveport, Louisiana, where he was then residing, on May 14, 1926, leaving a surviving widow, Mrs. Sarah Drain Eden-born, and two nephews, August Mann and E. Otto Mann, and two nieces, Mrs. Lena Mann Wigton and Mrs. Emma Mann Logan, children of a deceased sister. He left no legitimate descendants or ascendants.
 

 Beginning in the year 1897 Edenborn at various times made investments in Louisiana in timberlands and a short time thereafter engaged in the construction of a railroad which was later known as the Louisiana Railroad and Navigation Company. The road was built by the Louisiana Central Construction Company, which was owned by Edenborn, who advanced the cash for the operation. The construction company was paid by the railroad company with its first mortgage bonds which were transferred to Edenborn in settlement of the advances he had made. In 1909 Edenborn had acquired all of the bonds of the railroad company.
 

 The original location of the railroad required the transfer of trains a distance of eight miles by ferry at Angola, Louisiana. The ferry was operated by the Angola Transfer Company, which was also owned by Edenborn. Prior to his death Edenborn started a relocation of the railroad line with the view of obtaining a direct crossing of the Mississippi River in order to eliminate the expense and delay caused by the transfer of the trains a distance of eight miles by ferry at Angola for which purpose he had undertaken construction work which eventually cost in the neighborhood of $1,500,000. Tips-work was only partially completed and paid for at the time of his death.
 

 On May 17, 1926, three days after the death of Edenborn, Mrs. Sarah Drain Edenborn, E. Otto Mann, August Mann, R. E. Milling, E. H. Randolph, Allen Rendall, A. B. Freyer, E. P. Staman, and Paul Sippel met in the office of William Eden-born at Shreveport, Louisiana, to discuss the affairs of the estate of William Eden-born with the view of ascertaining the condition of the railroad, its value and the prospects of its disposal together with the view of ascertaining the rights of Mrs. Edenborn and the nieces and nephews in the estate. A search was made of the effects of Edenborn to see if he had left a will. It was found that he had revoked a will wherein he had bequeathed to E. Otto Mann and Mrs. Logan 4%. This meeting was continued from day to day for some four days and a written agreement was entered into on May 20, 1926, between Mrs. Edenborn and August and E. Otto Mann. This agreement was also signed a few days later by Mrs. Wigton and Mrs. Logan at Wheaton, Illinois. The agreement is as follows:
 

 “Agreement of May 20, 1926
 

 “Whereas Wm. Edenborn departed this life in Shreveport, La., on the 14th day of May, 1926, intestate but left certain fragments of papers indicating what would be his desire as to the distribution of his property, and
 

 
 *292
 
 “Whereas the only near relatives of Mr. Edenborn, other than his surviving wife, is his nephews and nieces, as follows:
 

 “August Mann, D'onora, Pa.,
 

 “Lena Mann, wife of Earnest T. Wigtpn, Wheaton, 111.,
 

 “Emma Mann, wife of S. R. Logan, Shreveport, La.,
 

 “Otto Mann, Shreveport, La., and under the laws of Louisiana, being the only blood relations who would be entitled to inherit his separate estate, if there is any, and
 

 “Whereas there are certain properties in his name situated in Missouri, Arkansas and Alabama and perhaps other States, and
 

 “Whereas Mrs. Edenborn, his. wife, has under the laws of Louisiana inherited his interest in all the community estate and has made application to the Court to be recognized as heir and placed in possession of the entire estate of whatever it consists,
 

 “Now Therefore:
 

 “In consideration of the premises and other good and valuable considerations, the said abovenamed nephews and nieces agree with Mrs. Edenborn that upon her carrying out the provisions expressed under the will made by Mr. Edenborn, dated at St. Louis, June 30, 1908 and afterwards revoked by him, that is to pay out of the succession each of the above named nephews and nieces four (4%) per cent, of the entire amount of the succession, and also pay to the wife of William Mann, two
 
 (2%)
 
 per cent., and that they will and do hereby, when the said payment is made, release and relinquish any and all claims which they have to any inheritance in the succession of said William Edenborn and assign and transfer to her any and ■ all such claims and relieve the succession from any claims whatever, and in addition thereto transfer to her all right, title, interest, claims and demands which they have against the succession of the said William Edenborn and in and to all the property in which they may have inherited an interest; and they further agree that they will join her in any legal proceedings for the purpose of placing her in possession of any property belonging to the succession and will sign any and all deeds of any nature whatever that may be necessary to fully vest in her the title and ownership to .said succession and property thereof.
 

 “It is miderstood and agreed between the parties, however, that as Mrs. Eden-born has not yet been recognized by judgment of the Court as widow in community and the owner by inheritance to one half of the community property, and owner of the other half in her own right, and as a great bulk of the estate is represented by the ownership in the stocks and bonds of the railroads of the Louisiana Railway & Navigation Company and the Louisiana Railway & Navigation Company of Texas, it is distinctly agreed and understood that this obligation shall not be enforceable until such time as these railroads can either be leased or sold or improved and put in condition that its securities will be listed upon the market and sold, or some disposition made of the
 
 *293
 
 property either by converting same into money or liquid assets which will be readily converted into money and until such time these percentages of the estate will not be required to be ascertained and delivered to the nephews and nieces and the parties named herein; and it is further understood also that Mrs. Edenborn will use the assets of the estate for the purpose of bringing about this improvement or liquidation of the railroad, and if in so doing money is lost and the estate is diminished by such operation or handling of the property, she will only be answerable for the percent, herein named of whatever remains of the estate after such liquidation and improvements, sale or other disposition thereof.
 

 “Thus done and signed by us in duplicate on this 20th day of May, 1926.
 

 “Witnesses:
 

 “R. E. Milling Mrs. Sarah Edenborn
 

 “Paul Sippel Aug. Mann
 

 E. O. Mann,
 

 “Norma Vogt, —I authorize my wife, Earnest T. Wigton
 

 “Mrs. Lena Wigton.
 

 “Anna L. Jarehow, I authorize my wife, S. R. Logan,
 

 “Mrs. Emma Mann Logan.”
 

 Mrs. Edenborn applied to the district court for the taking of inventories of the property belonging to the succession of the decedent alleging that all of the property belonged to the community. This application was made prior to May 20, 1926, the date that the agreement was signed. On June 18th she was sent into possession of the entire estate by judgment of court. The plaintiffs joined her in the petition and consented that such judgment be rendered with the reservation of their right of inheritance to the separate estate if any. Shortly thereafter Otto and August Mann had a conference with Mr. Sippel and Mr. Freyer' with the view of ascertaining whether the percentages set forth in the agreement were to apply to both the separate and the community effects, which resulted in the following letter from Mrs. Edenborn of date June 17, 1926, viz:
 

 “My dear Nephews and Nieces:
 

 “On the 20th of May, 1926, I executed an agreement with you by which I agreed to pay you each upon the winding up of the Succession of my late husband, William Edenborn, 4% of the entire amount of the Succession and also to pay to the wife of William Mann, 2%.
 

 “My intention in using the above expression was to indicate all the property of which William Edenborn died possessed, whether the same is Community or separate property, and the purpose of writing this at this time is so that there can be no misunderstanding or misconstruction as to what property the percentage should be paid on.
 

 “Yours truly,
 

 “Sarah Edenborn
 

 “Attest:
 

 “Allen Rendall.”
 

 It appears from the evidence in this case that there was considerable discussion had with the attorney for the Tax
 
 *294
 
 Collector -with reference to the community and separate effects and the question of debt being due the separate estate by the community. E. Otto Mann was present during the entire time.
 

 'Mrs. Edenborn, at the time the agreement was signed, appointed E. P. Staman and Paul Sippel, who had been in the employment of Mr. Edenborn for a long time, together with E. Otto Mann as her agents to handle the business of the entire estate and particularly the railroad which appointment was reduced to writing and provided that no action could be done except through the joint action of E. Otto Mann and at least one of the other agents. The work on relocating the railroad line was continued until its completion and afterwards sold for $10,000,000. It appears that before the Succession was finally settled there was a controversy with reference to the estate tax with the Revenue Department of the Federal Government which resulted in a compromise agreement on September 12, 1932. E. Otto Mann participated in conferences with reference to this adjustment. In pursuance to the agreement of May 20, 1926, a final settlement was made with E. Otto Mann and Mrs. Emma M. Logan on June 14, 1929. The receipts signed by the parties were identical in form and we quote the receipt signed by E. Otto Mann:
 

 “I, the undersigned, hereby acknowledge to have received from Mrs. Sarah Eden-born:
 

 "1. Participation certificate issued by Commercial Bank of Shreveport, La., in a certain collateral trust note dated May 1, 1929, executed by H. C. Couch, C. S. McCain and Dillon Read & Co., as Syndicate Managers, secured by certain col-laterals as set forth in said collateral trust agreement in the amount of one hundred thousand & no/100 (100,000.00) Dollars.
 

 “2.
 
 A certain collateral trust note dated May 8, 1929, executed by H. C. Couch, C. S. McCain and Dillon Read & Company as Syndicate Managers, secured by certain collaterals as set forth in said collateral trust agreement, bearing interest at the rate of
 
 6%
 
 per annum, and payable six months after date subject to the right of the makers to pay same at any time prior to maturity on fifteen days notice with interest to date of payment as. set forth in copy of letter addressed to Mrs. Sarah Edenborn dated May 8, 1929, attached to said note, for the principal sum of Eighty Thousand ($80,000.00) Dollars.'
 

 “3. Check payable to my order for the sum of one hundred and fifty four thousand, seven hundred and fifty six & no/100 (154,756.00) Dollars'.
 

 “Said check and securities are accepted by me in full settlement of any right, title, interest, claim or demand which I have or may have in and to the estate, property, real and personal rights, chooses of action, or any other property wherever situated, belonging to or standing in the name of William or Sarah Edenborn and or of which the said William Edenborn died possessed, both by reason of the operation of law and by the terms of the agreement of May 20, 1926, between Mrs. Sarah Edenborn and the undersigned.
 

 
 *295
 
 “Except that it is understood and agreed that in arriving at the amount of the settlement herein made there has been deducted and set aside in cash and property the sum of two million and forty thousand, four hundred ninety five & 81/100 ($2,040,495.81) dollars, for the final payment, compromise and adjustment of Estate and Inheritance Taxes, claims against the Louisiana Railway & Navigation Company for which the said Mrs. Sarah Eden-born or the succession of William Eden-born may in any manner be" liable, and all other claims or contingencies in connection with the succession of said William Edenborn and/or the inheritance thereof by the said Mrs. Sarah Edenborn, and that upon the final payment, compromise and adjustment of all of said taxes, claims and contingencies there shall be paid to me out of any amount of the principal sum of said two million and forty thousand, four hundred ninety-five and 81/100 ($2,-040,495.81) dollars remaining in the hands of the said Mrs. Sarah Edenborn an amount equal to four (4%) per cent of said remainder. The true purpose of the above reservation is that Mrs. Edenborn shall pay out of said amount reserved, all claims, including costs, and attorneys fees, if any, for which she or the undersigned may be liable.'
 

 “E. O. Mann
 

 “Shreveport, Louisiana
 

 “June 14th, 1929
 

 “Witnesses:
 

 “A. B. Freyer
 

 “E. A. Staman”
 

 The plaintiffs in these suits are seeking to set aside the judgment of the district court putting Mrs. Edenborn in possession of the entire estate and to set aside the receipt of June 14, 1929, representing the final settlement with the plaintiffs in conformity with the agreement of May 20,
 
 1926.
 

 An exception of nonjoinder was sustained in the district court insofar as the deman¿ 0f the plaintiffs sought the annulment of the judgment sending Mrs. Eden-born into possession of the entire estate on the ground that all the parties were not made party to the suit. It would appear that there is no necessity to pass on this exception except in event it is determined that the plaintiffs have proven sufficient grounds to set the judgment aside. The grounds upon which the plaintiffs are seeking to set aside the instrument of date June 14, 1929, are to the effect that there was error in the settlement superinduced by the misrepresentations of the defendant and her agents. The plaintiffs also contend that the settlement should be set aside on the ground of lesion.
 

 The alleged misrepresentations are based on facts that transpired at the conference held immediately after the death of Eden-born. The plaintiffs allege:
 

 “That immediately upon the death of the said William Edenborn, said Mrs. Sarah Edenborn and other persons representing her and the succession of William Eden-born, including attorneys for Mrs. Edenborn and who had been to petitioner’s knowledge her uncle’s attorneys and confidential advisers in all his business in Louisiana, represented to your petitioner and advised her that William Edenborn had left no sep
 
 *296
 
 arate property, but that everything of which he died possessed was community property, from the day of the death of the said William Edenborn and continuously thereafter, the said parties continued their representations to your petitioner that there was no separate estate of the said William Edenborn, but that all his property was community property, and accordingly, was inherited by his wife.”
 

 It was also alleged in the plaintiffs’ petitions that Mrs. Edenborn had stated that in order to carry out.the wishes of her husband she would give the plaintiffs an interest in the estate purely as a gratuity.
 

 The testimony offered in support of the allegations of misrepresentations consist of that given by August and E.. Otto Mann. They testified in substance that R. E. Milling, Sr., and E. H. Randolph, attorneys and personal friends of long standing of the decedent, had stated at the meetings held on May 17, 1926, three days after the death of the decedent, and thereafter until the agreement was signed on May 20 that all of the estate left by William Edenborn was community property and would fall to Mrs. Edenborn; that there was no separate property and under the law the plaintiffs would receive nothing except what the defendant saw fit to give them which would be a gratuity on the part of Mrs. Edenborn in order to carry out the wishes of her deceased husband in accordance with the revoked will. An examination of this testimony shows that there is a variation between- them as to which one of the attorneys acted as spokesman. Their testimony is not of a satisfactory character. In the opinion of the trial judge of the federal district court in similar suits based on the testimony herein we find this statement with reference to the testimony of these two witnesses, viz:
 

 “Both made exceedingly poor witnesses and had to be admonished many times to answer questions which appeared to the Court to be simple and easy of understanding.”
 

 The trial j’udge in this case stated in his opinion that their testimony was most unimpressive. In our examination of their testimony we have reached the same conclusion. ,
 

 One of the circumstances that the plaintiffs rely on as corroborative is the fact that the same attorneys, all of whom represented the succession until its final settlement and who are defending the present suit, have álways contended that all of the property in Louisiana belonged to the community. They urge that the probabilities are that they made expressions to this effect to the plaintiffs and co-heirs. It is pointed out that E. Otto Mann called attention to the fact that the books were in the office and would disclose the status of the estate and its ownership. It is suggested that the fact that while the discussions were going on the attorneys opened the succession alleging the property belonged to the community is a circumstance which should be considered as supporting the plaintiffs’ position.
 

 The testimony offered on behalf of'the defendant consists of all the other parties, who attended the conference beginning on
 
 *297
 
 June 17, 1926, viz: Mrs. Sarah Drain Edenborn, the defendant herein, R. E. Milling, Allen Rendall and A. B. Freyer, attorneys, and E. P. Staman and Paul Sippel, employees of Edenborn over a long period of time. An affidavit of E. H. Randolph, who had died prior to the trial in the federal court was also introduced in evidence, the pertinent part of which reads as follows :
 

 “That during such discussions it was stated to the said Mrs. Edenborn, to August and E. O. Mann, and the other parties, that, under the law of Louisiana and held (evidently referring to property) by William Edenborn at the time of his death, was presumed to be community property, an undivided one-half interest in which Mrs. Edenborn, as widow, in her own right, was the owner, and in the absence of any direct ascendants and descendants of William Edenborn she inherited his undivided one-half interest in such community; that the said August Mann and E. O. Mann, as nephews and their sisters, Mrs. Emma Logan and Mrs. Lena Wigton, nieces of said William Edenborn were the nearest of kin of the said William Edenborn and as such were entitled to inherit any separate estate of the said William Edenborn existing at the time of his death. That there was also discussed with said parties the facts that William Edenborn moved to Louisiana in 1907, prior to which time he had made large investments in timber lands and expended large sums of money in the construction of the railroad property originally known as the Shreveport & Red River Valley Railway and subsequently as the Louisiana Railway & Navigation Company; there was also discussed the method and manner of the construction of said railroad through the organization of a construction company which contracted with the Railway Company for the building of the railroad for a consideration to be paid for in stocks and bonds of said railway company, all of the stock of the construction company and the railroad companies involved having been owned continuously by the said William Edenborn; that there was also explained to the said Mrs. Edenborn and to August and E. O. Mann and all others above mentioned, that the community estate consisted of all property acquired in Louisiana during the existence of the community in the name of either husband and wife, unless it was acquired by the separate funds of the husband or wife, or by separate donation, all other property, including the income from separate property under the administration of the husband, falling into the community. It was further discussed at such times that before moving to Louisiana said Edenborn had acquired considerable wealth while in the states of Illinois and New York, all of which was invested in Louisiana, either before or after William Edenborn and his wife moved to said state and that at the time of the death of said William Edenborn he owned property in his name in the State of Missouri, Arkansas and Alabama. It was stated to said parties that under the law of Louisiana an indebtedness would be created by law due from the community estate to the separate estate in such amount as would represent any sums belonging to the separate estate of the husband which, were lised to
 
 *298
 
 acquire community property, which indebtedness would be the property of the separate estate and be inherited by said nearest of kin.”
 

 Mr. Randolph was an attorney of recognized standing in this State. After examining the testimony of all the other witnesses offered by the defendant we find that their testimony is substantially in accord with the statements contained in Mr. Randolph’s affidavit. It appears from the preponderance of testimony that at the time of the death of Edenborn that the railroad was in a precarious condition and that its value and asset was doubtful. It was necessary to complete the road in order to give it any reasonable going concern value. At the conferences held the chief concern of all the parties was the precarious condition of the railroad. It was necessary to use the effects of the succession, community and separate, in order to complete the improvements and dispose of the road. August and E. Otto Mann were experienced business men and held confidential positions with the decedent during his lifetime that gave them unusual information as to the condition of his property. In fact they were in a better position to know the affairs of the decedent than Mrs. Edenborn. The parties at the conference undoubtedly Recognized this fact when Mrs. Edenborn appointed E. Otto Mann together with E. P. Staman and Paul Sippel, two former employees of the decedent, as her agents to handle the affairs of the estate and particularly that of the railroad. Especially is this true because Mrs. Edenborn required that any action by either of these agents must be taken jointly with E. Otto Mann. E. Otto Mann attended all the conferences discussing the status of the property and participated in the adjustment of the taxes due the State and Federal Government with reference to the property of the estate. Moreover, E. Otto and August Mann were instrumental in having it distinctly understood that the percentage of the estate allowed the nieces and nephews under the agreement would apply to the community as well as the separate property.
 

 Under the testimony in this case we cannot but reach the conclusion that there was no fraud or misrepresentation. We are fortified in this conclusion by that of three other courts who have reviewed this same testimony, viz: the trial court, the federal district court and the federal circuit court of appeals.
 

 Counsel for the plaintiffs contend that the instrument of June 14, 1929, should be set aside because of lesion beyond one-fourth, In support of this contention counsel relies on Articles 1398, 1402, 1407 and 1860 of the Revised Civil Code. Counsel takes the position that at the time this instrument was executed Mrs. Edenborn and her agents, the attorneys, alone knew the value of the succession and permitted the plaintiffs to remain in ignorance of it. He concedes that in order to maintain his position that two things must be proved: first, the purchaser alone knew the value of the succession; second, the purchaser permitted the vendor to remain in ignorance of it. The plaintiffs contend that the document signed on May 20, 1926, was merely preliminary and the agreement must
 
 *299
 
 be construed entirely with reference to the receipts given June 14, 1929. There have been contentions advanced in respect to the instrument of May 20, 1926, to the effect that it is a partition; that it is compromise and that it is a sale. We do not think it is material whether you call it a compromise or something else. The agreement was entered into in good faith and for the benefit of all the parties concerned. We cannot agree with plaintiffs’ contention that the instrument of June 14, 1929, can be considered without reference to the instrument of May 20, 1926. The agreement of May 20, 1926, in our opinion is complete in itself. It would have been executed at the time the payments were made even though no receipt had been given at that time. In determining whether adequate consideration was given, the situation as it existed when the agreement of May 20, 1926, was entered into must be taken into consideration. At that time the railroad company was in a precarious condition and required the use of the assets of the entire estate in order to complete the improvements that had been undertaken. It took some three years to complete the improvements and to establish the road as a valuable going concern. At the time the agreement of May 20, 1926, was entered into undoubtedly E. Otto Mann, from the evidence in this case, knew more about the estate of the decedent and the value thereof than the defendant or the attorneys. Certainly he knew more about the estate and its value during the three-year period beginning on May 20, 1926, and ending sometime in 1929 when the railroad was sold because he had practical control and management of the affairs of the estate as well as the railroad. During this long period of time, although he was in a better position to know the affairs of the estate than anyone, not once did he question the reasonableness or the fairness of the agreement of May 20, 1926. After the railroad was sold he received a settlement under the agreement of May 20, 1926, on June 14, 1929, as evidenced by the receipt in this record. The present suits were instituted on January 25, 1933, nearly four years after plaintiffs had received settlement and nearly seven years after plaintiffs had entered into the agreement of May 20, 1926. The evidence shows that E. Otto Mann has acted as the agent of Mrs. Logan throughout the entire transactions.
 

 Under the facts in these cases the plaintiffs have failed to prove that the purchaser or her attorneys alone knew the value of the separate estate as of date May 20, 1926, or that plaintiffs were in ignorance of its value. Moreover, they have failed to prove that the consideration given was inadequate at the time the agreement of May 20, 1926 was entered into.
 

 For the reasons assigned the judgment of the lower court is affirmed at appellants’ cost.